Mark FURLINE and Howard University, Appellants/Cross–Appellees,

v.

Cynthia L. MORRISON, Appellee/Cross–Appellant.

Nos. 04–CV–1029, 04–CV–1114.

District of Columbia Court of Appeals.

Argued Dec. 19, 2006.

Decided July 24, 2008.

these prohibitions apply where human resources personnel or other disinterested officials of an employer, who have no discriminatory or retaliatory ax to grind, decide to discipline an employee for legally permissible reasons on the biased recommendation of a low-level supervisor. We conclude that the issue turns on whether the supervisor's biased participation undermined the autonomy of the ultimate decisionmaking process. Where, as in this case, decisionmakers presented with a possibly biased recommendation conducted their own independent investigation, which included hearing from the employee, and did not rely on the supervisor in any material way, the resulting adverse personnel action cannot be said to have been taken by the employer for a prohibited reason, and therefore does not violate the DCHRA. Our conclusion necessitates reversal of the judgment for the employee that is challenged in this appeal.

Jeanett P. Henry, Washington, with whom Sandra A. Maddox was on the briefs, for appellant/cross-appellee Furline.

Musa L. Eubanks, with whom Phillip A. Lattimore, III, was on the briefs, for appellant/cross-appellee Howard University.

Ellen K. Renaud, Washington, with whom Richard L. Swick was on the briefs, for appellee/cross-appellant Morrison.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and STEADMAN, Senior Judge.

GLICKMAN, Associate Judge:

The District of Columbia Human Rights Act (DCHRA) prohibits employers from taking adverse personnel actions for discriminatory reasons or to retaliate for opposition to unlawful discrimination. The instant appeals require us to consider how

I.

Cynthia Morrison, a forty-six-year-old registrar in the Emergency Care Area (ECA) of Howard University Hospital, was suspended without pay for five days in June 2001. The ostensible reason for her suspension was her absence from work without leave or justification after having been counseled and reprimanded for her prior unsatisfactory attendance. The five-day suspension was authorized by the applicable collective bargaining agreement and was imposed after a hearing conducted by the hospital's Office of Human Resources. Aggrieved by this disciplinary action, Morrison filed a lawsuit in Superior Court against Howard University and Mark Furline, one of three supervisors who proposed her suspension. Morrison alleged that she was the victim of employment discrimination in violation of the DCHRA. Her central claim, the focus of

these appeals, is that Furline recommended her suspension to retaliate against her for lodging an age discrimination complaint against him, and also because of his discriminatory animus against older employees in his department. In addition, Morrison's complaint asserted a claim of hostile work environment.

The trial court granted partial summary judgment to the defendants on Morrison's age discrimination and hostile work environment claims. Regarding the former claim, the court ruled that Morrison had not made a *prima facie* showing that her suspension evinced intentional discrimination on the basis of age because she presented no evidence that any similarly situated younger employee was treated differently. As to the hostile work environment claim, the court ruled that the alleged harassment on which Morrison relied was largely unsubstantiated or not linked to age discrimination, and in any event was not severe and pervasive enough to alter the terms or conditions of Morrison's employment.

The court did not grant summary judgment on Morrison's retaliation claim, however, and that claim proceeded to trial. Defense motions for a directed verdict were denied and the jury found in Morrison's favor, awarding her $15,000 in compensatory damages and $100,000 in punitive damages. The defendants' subsequent motions for judgment notwithstanding the verdict or a new trial also were denied.

The appeals of Furline and Howard University raise a number of challenges to the judgment against them on the retaliation claim, while Morrison's cross-appeal attacks only the grant of summary judgment on her age discrimination claim (and not the adverse ruling on her hostile work environment claim). As we find it unnecessary to reach or resolve most of the issues the parties raise, we set forth only those facts, established at trial, that are pertinent to the ground on which we rest our decision.

*Morrison's Complaint Against Furline*

Morrison started working as an ECA registrar at Howard University Hospital in 1983, but her age discrimination and retaliation claims arose after the hospital hired Mark Furline as an ECA supervisor and some thirteen new registrars in late 2000. Most of the new hires were in their twenties. Morrison and others perceived that Furline, who was one of three ECA supervisors, exhibited favoritism toward the younger registrars and hostility toward the older workers. Further roiling the workplace, rumors spread that the younger workers were being paid more than the older veterans, though in fact that was not so.

On March 16, 2001, a screen saver message was left on a computer in the registrars' work area asking why the younger registrars were (supposedly) better compensated than their older, more experienced colleagues. This message came to Furline's attention and he chose to respond with a screen saver message of his own, which he placed on a computer in a registration booth frequently used by Morrison. Furline wrote that the younger employees were being paid more because "they are younger, dependable, and more productive, that's why!" Witnesses testified that Furline told them he "would like to see the expression on Ms. Morrison's face when she sees this."

Morrison saw Furline's screen saver message the following day. Her facial expression is not reported, but she and other employees complained to Benjamin Zachariah, the hospital's Director of Business Operations. The specifics of Morrison's complaint to Zachariah are not entirely

clear, but judging by its verdict, the jury found that she charged Furline and the hospital with age discrimination. Zachariah responded to the complaints by chastising Furline for leaving the screen saver message and directing him to apologize to the entire ECA staff, which Furline did, personally and in writing. There was no direct evidence at trial that Furline was informed of Morrison's complaint; Zachariah denied having told Furline who had complained about him, and Furline denied having learned that Morrison had done so. However, in finding that Furline's subsequent disciplinary actions against Morrison were retaliatory, the jury evidently inferred that he knew (or at least believed) she had complained about him. Whether there was sufficient evidence at trial to support that inference is debatable, but we shall assume for the sake of argument that Furline was aware or suspected that Morrison had lodged an age discrimination complaint against him.

### Morrison's Disciplinary Suspension

Morrison and the other registrars in the ECA were covered by a collective bargaining agreement, pursuant to which they were subject to "progressive" discipline for absenteeism, tardiness and excessive use of sick leave. Prior to the screen saver incident, Morrison was identified as a candidate for such discipline. In November 2000, hospital management commenced a three-month study to document and address time and attendance problems among the registrars. The study confirmed that problems of absenteeism, lateness, and apparent abuse of leave were widespread; in February 2001, sixteen of the nineteen registrars were counseled about the need to improve their attendance. One of those sixteen registrars was

Morrison. The time and attendance study showed that from November through January, Morrison used 55 hours of unscheduled leave, which included five days (40 hours) she took off at the beginning or end of her work week.[1] On February 2 and 5, 2001, a Friday and a Monday, Morrison took an additional sixteen hours of unscheduled leave. Although Morrison charged all this time to sick leave, claiming she was genuinely ill, the pattern suggested she might have been abusing her leave in order to lengthen her weekends. In mid-February, Furline informally counseled Morrison about her attendance—the first step in progressive discipline—and referred her to the hospital's employee assistance program for a fitness-for-duty examination. The examination confirmed Morrison's ability to work without restrictions or accommodations.

The following month, however, Morrison used another sixteen hours of unscheduled sick leave to take off March 5 and 19—two Mondays. Thus, over the five-month period from November through March, Morrison used a total of 87 hours of unscheduled leave, mostly by taking off Mondays or Fridays (72 hours). As Morrison already had been counseled about her attendance in February, Furline and the other two supervisors in the ECA jointly issued her a formal letter of reprimand on March 27, 2001. This letter, the next step in progressive discipline under the collective bargaining agreement, warned Morrison that if she did not show "immediate improvement" in her "time and attendance," she would face further disciplinary actions "up to and including suspension and/or termination." As Morrison emphasizes, she was given this reprimand only ten days after

---

1. The compilation of Morrison's unscheduled leave in November through January may have included one hour in error, when she may or may not have arrived at work late. The error, if there was one, is immaterial.

she complained about Furline to Zachariah.[2]

The conduct that precipitated Morrison's suspension occurred in May 2001, approximately two-and-a-half months after she complained about Furline's screen saver message. Starting on May 9, the posted work schedules for the ECA showed Morrison as having to work on the Memorial Day holiday, which was Monday, May 28. Morrison objected to that duty assignment, but the work schedules, which went through several revisions over the course of the month, were not changed to give her Memorial Day off. Beginning on May 22, the posted schedules also showed Morrison as working on May 29. Nonetheless, Morrison did not report for duty at all on May 28, nor did she call in. The following morning, after Morrison again failed to check in, a co-worker called her at home and summoned her to work. Morrison called her usual ECA supervisor on the day shift, Virginia Peterson (who was at home), and spoke to Zachariah, telling them both that she had been confused and had thought she was off duty on both May 28 and 29. Furline (the supervisor on duty on May 29) and Zachariah sent her home for being absent without leave.

Under the progressive discipline scheme set out in the collective bargaining agreement, the next disciplinary step after a reprimand (and before termination) was a suspension for up to five days without pay. Although the ECA supervisors were not authorized to suspend (or terminate) an employee, they could recommend such action. Such recommendations were subject to multiple layers of review and approval by upper levels of management and the Office of Human Resources.

On May 29, Furline prepared a written recommendation for Morrison's suspension. Virginia Peterson and Yvonne Bracey, the third ECA supervisor, joined in submitting the recommendation, which stated the grounds for suspension as follows:

> The reason for this decision [to recommend suspension] is her not reporting for duty on Monday, May 28, and Tuesday, May 29, 2001. [Morrison] never phoned in stating why she would not be able to work on either day. This rendered her AWOL (Absent Without Leave).

> Since the beginning of May, Ms. Morrison has voiced concerns regarding being placed on the schedule for the May 28, Memorial Day holiday. On Tuesday, May 29, 2001, Ms. Morrison contacted Mrs. Virginia Peterson. Mrs. Peterson was at home ill, not on duty and not on call. However, Mrs. Peterson contacted Mr. Furline, on Ms. Morrison['s] behalf, to express that Ms. Morrison may have been confused by the schedule. Although several schedule revisions were made, Mr. Furline reminded Mrs. Peterson that Ms. Morrison has always been scheduled for duty on Monday, May 28, 2001.

> In light of the fact that Ms. Morrison was recently counseled regarding her time and attendance and has since acquired two (2) AWOL's, we are recommending suspension, the next step in the disciplinary process. We are requesting the maximum of five (5) days for her actions.

---

2. Moreover, in April 2001, Morrison's supervisors recommended that she be given a disciplinary suspension "for her consistent abuse of unscheduled leave." The Office of Human Resources rejected this recommendation as premature, inasmuch as Morrison had just received a reprimand and there was no documentation showing that she had used any unscheduled leave after March 19, 2001.

The facts set forth in this recommendation are not in dispute. The recommendation was approved by Zachariah[3] and the Chief Financial Officer. It then was transmitted to the Assistant Director of Human Resources for decision.

Pursuant to the collective bargaining agreement, the Office of Human Resources afforded Morrison a hearing on whether sufficient grounds existed to suspend her. The June 7, 2001, hearing, at which Morrison had an opportunity to speak and present evidence on her own behalf, was conducted by an "employee and labor relations specialist." Morrison elected to proceed without the union representation to which she was entitled. She did not dispute the factual basis for the proposed five-day suspension or the propriety of her recent reprimand, nor did she complain of any unfair treatment by her supervisors. She did not bring up the screen saver incident or raise any claim of age discrimination or retaliation. Rather, Morrison said she simply had misread the schedule for the Memorial Day weekend. She attributed her mistake to an ambiguity in the schedules posted prior to May 22 regarding the day after Memorial Day. As she explained in her June 7 letter to the hospital's Chief Financial Officer, prior to May 22 her work schedule had the letter "H" (for "holiday") on Tuesday, May 29, and "Off" in the next block (Wednesday, May 30); "[k]nowing that the holiday was on Monday and the next day Tuesday, my usual off day after working the weekend, I thought I was off the (H) Holiday and off Tuesday." The facts remained, though, that Morrison always was scheduled to work on May 28, and that the ambiguity with respect to May 29 was corrected in the revised schedule issued on May 22, 2001. From then on, the schedule showed that Morrison was to be at work on both Monday and Tuesday, May 28 and 29— there was no "H" on either date—and "Off" on Wednesday, May 30.[4]

Furline attended the June 7 hearing. The record does not disclose the nature of his participation, but there is no evidence that his input (if any) went beyond the undisputed facts set forth in his written recommendation. As it appears, the information adduced at the hearing was limited to Morrison's absence without leave on

---

3. At trial, Zachariah testified that Furline told him he had tried to contact Morrison on Memorial Day when she did not show up for work, and that he would not have approved her proposed suspension had he known no such attempt was made. This testimony, which suggests that Zachariah relied on misinformation supplied by Furline, is somewhat puzzling because Furline (who contradicted Zachariah and denied ever saying he had tried to contact Morrison) was not working on Memorial Day. The ECA supervisors were not required to try to locate unexpectedly absent employees, though it may have been customary, and it is not clear why their failure to do so in Morrison's case would have made a difference with respect to the imposition of discipline. Nonetheless, Morrison argues, and we shall assume, that Furline misled Zachariah in order to engineer her suspension for retaliatory and discriminatory reasons. There is no evidence that anyone else was misled.

4. Morrison testified that she had not looked at the later-posted revised schedules herself, but instead had relied on a co-worker, Cheryl Robinson–Haili, who incorrectly told her on Friday, May 25, that she would be off duty the following Monday and Tuesday. Robinson–Haili confirmed that she inadvertently had misinformed Morrison.

Morrison claimed she furnished this explanation for her absence to Zachariah on May 29. However, neither Zachariah nor Peterson recalled hearing that Morrison had relied on Robinson–Haili, and—most important, for present purposes—it appears Morrison made no mention of it at her hearing or in her letter to the Chief Financial Officer.

May 28 and 29, 2001, and her previous attendance and disciplinary record.

The employee and labor relations specialist presiding over the hearing recommended Morrison's suspension go forward.[5] The Assistant Director of Human Resources approved the recommendation. The decision was ratified by the hospital's Chief Operating Officer and the Office of General Counsel. There is no evidence any of these officials knew Morrison had complained of age discrimination, or that she was subjected to different or harsher discipline than similarly situated younger employees with comparable attendance problems.[6] There likewise is no evidence that any of Morrison's superiors (other than Furline) was biased against older employees or motivated to take adverse action against Morrison for discriminatory or retaliatory reasons.

Morrison's five-day suspension took effect on June 24, 2001.

## II.

■ The ultimate question presented by these appeals with respect to Morrison's claims of retaliation and intentional age discrimination is the same: why was she suspended? Furline and Howard University contend she was suspended for the reason stated at the time, her unexcused absence from work, and not for any reason violative of the DCHRA. Morrison contends the stated justification was pretextual. She argues that Furline recommended her suspension for impermissible retaliatory and discriminatory reasons,[7] and that his involvement tainted the final decision even though he was not the actual decisionmaker.[8] If the jury followed the trial court's instructions, it found that Furline did indeed propose Morrison's suspension in retaliation for her discrimination complaint, and that his retributive motive "played a substantial part in the suspension decision, even though other factors

5. Although the hearing and its results were described at trial, the memorandum containing the employee and labor relations specialist's written findings and recommendation was not introduced in evidence, but it is part of the record on appeal as an exhibit to the defendants' motion for summary judgment. The memorandum concludes as follows:

 Based upon the record and representations made during the meeting, Ms. Morrison had always been scheduled for duty on Monday, May 28, 2001, the Memorial Day holiday. In spite of subsequent revisions to the schedule, revisions Ms. Morrison conceded she was aware of at the time they were made, the holiday schedule remained the same. Furthermore, the schedule change requiring Ms. Morrison to work on Tuesday, May 29th, made on May 22, 2001, was done in sufficient time to give Ms. Morrison notice of the adjustment.
 In light of the foregoing, the recommendation for suspension should proceed forward.

6. "Indeed," the trial court found when it granted summary judgment to the defendants

on Morrison's age discrimination claim, "strong evidence in the record tends to show that the defendants consistently took comparable, measured steps to address time and attendance problems of registrars of all ages and that older registrars who had no such problems were not disciplined."

7. Morrison concedes she could not support her age discrimination claim with evidence that any similarly situated younger employees were treated more leniently than she was. She argues that other evidence, such as testimony Furline socialized with the younger employees and was indulgent when they took long lunches and were late for work, would have permitted the jury to infer his discriminatory intent in recommending her suspension and thus precluded summary judgment.

8. On appeal, Morrison argues that the jury could have concluded that Zachariah, the recipient of her age discrimination complaint, also might have been motivated to retaliate against her in approving her suspension. Indulging this hypothesis, which Morrison did not advance at trial, would not alter our reasoning or our conclusion in this opinion.

also may have motivated" the decision.[9]

We conclude that the jury's determination cannot be sustained. Even if Furline's recommendation was vindictive or discriminatory (which he denies), the review process ensured that Morrison was disciplined solely for the legitimate reason given. We therefore hold that Furline and Howard University were entitled to judgment as a matter of law on Morrison's claims of retaliation and age discrimination.

### A.

Civil Rule 50(a)(1) states: "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the Court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."[10] On a motion for judgment as a matter of law (either a motion for a directed verdict or a motion for judgment notwithstanding the verdict), the evidence must be viewed in the light most favorable to the non-moving party.[11] "[T]he opponent of the motion must be given the benefit of every reasonable inference from the evidence, but not 'inferences based on guess or speculation.'"[12] All of the evidence in the record must be considered, moreover, not merely the evidence favorable to the non-moving party.[13] If the evidence, so viewed, is insufficient to support a verdict for that party—in other words, if no impartial juror reasonably could find in that party's favor—then the movant is entitled to judgment as a matter of law.[14] "Whether the evidence was sufficient to go to the jury is a question of law, which we consider de novo."[15]

The same basic principles govern our review of the trial court's award of summary judgment on Morrison's claim of age discrimination. Civil Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-

---

9. Requiring the plaintiff to prove that an impermissible motive played a *substantial* part in the decision to suspend Morrison may have been overly favorable to the defendants. As we discuss below, the DCHRA does not impose a "substantiality" requirement.

10. Super. Ct. Civ. R. 50(a)(1).

11. *See, e.g., Washington Metro. Area Transit Auth. v. Jeanty*, 718 A.2d 172, 174 (D.C.1998).

12. *Vogel v. District of Columbia Office of Planning*, 944 A.2d 456, 464 (D.C.2008) (quoting *Brown v. Nat'l Acad. of Sciences*, 844 A.2d 1113, 1122 (D.C.2004), and *Rule v. Bennett*, 219 A.2d 491, 494 (D.C.1966)).

13. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (construing Rule 50 of the Federal Rules of Civil Procedure). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.... That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151, 120 S.Ct. at 2111 (quoting 9A *C. Wright & A. Miller, Federal Practice and Procedure* § 2529, at 300 (2d ed.1995)).

14. *Jeanty*, 718 A.2d at 174.

15. *Id.* (citations omitted).

ment as a matter of law."[16] Again, our review is de novo.[17] "Although we view the evidence in the light most favorable to the party opposing the motion, conclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment."[18]

The DCHRA makes it "an unlawful discriminatory practice" for an employer to take adverse action against an employee "wholly or partially for a discriminatory reason based upon ... age...."[19] The DCHRA also makes it unlawful to retaliate against an employee for opposing an employment practice that is prohibited by the Act.[20] Where, as here, the claims of inten-

tional discrimination and retaliation rely on circumstantial evidence, rather than direct evidence linking the personnel action to a forbidden motive, we evaluate them utilizing the tripartite burden-shifting framework set forth in *McDonnell Douglas*[21] for such cases brought under Title VII of the Civil Rights Act of 1964.[22] Under that framework, as we explained in *Hollins*,[23] the burden initially is on the employee to make a *prima facie* showing of discrimination or retaliation by a preponderance of the evidence.[24] Such a showing raises a presumption that the employer violated the DCHRA, which the employer is obliged to rebut by articulating a legitimate, non-discriminatory reason for the challenged personnel decision.[25]

---

**16.** Super. Ct. Civ. R. 56(c).

**17.** *See, e.g., McFarland v. George Washington Univ.*, 935 A.2d 337, 345 (D.C.2007) (citation omitted).

**18.** *Id.* (internal quotation marks, brackets and citation omitted).

**19.** D.C.Code § 2–1402.11(a) (2007 Repl.Vol.).

**20.** *See* D.C.Code §§ 2–1402.11(a), 2–1402.61(a) (2007 Repl.Vol.); *Vogel*, 944 A.2d at 463, 463 n. 12.

**21.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (noting that "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case"); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").

**22.** 42 U.S.C. §§ 2000e *et seq.*

**23.** *Hollins v. Fed. Nat'l Mortgage Ass'n*, 760 A.2d 563, 571–72 (D.C.2000).

**24.** *See id.* at 571. "[T]he precise requirements of a *prima facie* case can vary depend-

ing on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992. Broadly speaking, "to state a *prima facie* claim of disparate treatment discrimination, the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 339 U.S.App. D.C. 233, 239, 199 F.3d 446, 452 (1999) (citations omitted). Analogously, "[a]n employee may make out a *prima facie* case of retaliation by demonstrating that: (1) she engaged in a protected activity by opposing or complaining about employment practices that are unlawful under the DCHRA; (2) her employer took an adverse personnel action against her; and (3) there existed a causal connection between the protected activity and the adverse personnel action." *Vogel*, 944 A.2d at 463.

**25.** The burden on the employer is one of *production,* not *persuasion. Hollins*, 760 A.2d at 571 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The employer need only produce "admissible evidence from which the trier of fact [can] rationally conclude that the employment action [was not] motivated by discriminatory animus." *Hollins*, 760 A.2d at 571 (quoting *At-*

Once the employer has done so, the presumption of illegality "drops from the case,"[26] and the employee ordinarily must prove by a preponderance of the evidence "*both* that the reason [offered by the employer] was false, *and* that discrimination was the real reason."[27] Alternatively, under the DCHRA, the employee may prevail by proving that the employer's action was motivated "partially" by a discriminatory reason, even if it also was motivated by permissible reasons not, in themselves, pretextual. In the latter case, a "mixed motive" analysis is appropriate.[28] Either way, the burden of persuasion "remains at all times" with the plaintiff employee[29] to prove that the employer took adverse ac-

tion for a discriminatory or retaliatory reason (in whole or part).

In the present case, because Howard University produced evidence that it suspended Morrison for a legitimate, non-discriminatory reason, we need not pause to analyze whether she made out a *prima facie* case of retaliation at trial or of age discrimination in opposing summary judgment.[30] Instead we may proceed to answer the ultimate question—whether Morrison presented sufficient evidence for a jury to find that retaliation or age discrimination "actually motivated the employer's decision."[31] In general, the focus at this stage is on "whether the jury could infer

---

*lantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099–1100 (D.C.1986)).

**26.** *Hollins*, 760 A.2d at 571 (quoting *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. at 1095 & n. 10).

**27.** *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742) (emphasis in the original quote).

**28.** When mixed motive analysis is triggered under Title VII, the burden of persuasion shifts to the employer to prove by a preponderance of the evidence that it would have taken the same personnel action for the permissible reasons alone. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). We presume that an employer would be entitled to the same affirmative defense under the DCHRA.

In *Hollins*, this court said that only "cases involving direct evidence of discrimination are analyzed under the 'mixed motives' analysis articulated by the Supreme Court" in *Price Waterhouse*. 760 A.2d at 574–75. Subsequently, however, the Supreme Court held that Congress eliminated the direct evidence requirement for mixed motive cases under Title VII in 1991, by amending Title VII to provide that an unlawful employment practice is established if the complainant demonstrates that discrimination "was a motivating

factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2 (m). *See Desert Palace*, 539 U.S. at 101, 123 S.Ct. 2148. Because the DCHRA prohibits personnel actions taken "wholly or partially" for a discriminatory reason (a standard comparable to that in § 2000e–2 (m)), and establishes no heightened evidence requirement, we may assume, *pace Hollins*, that it too does not require direct evidence for mixed motive cases. *But see Jung v. George Washington Univ.*, 883 A.2d 104, 105 (D.C.2005) (leaving open whether the 1991 amendments to Title VII "require, or make advisable, a corresponding change in the principles governing jury instructions in mixed-motive claims of discrimination" under the DCHRA).

**29.** *Hollins*, 760 A.2d at 571 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742, and *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

**30.** *Cf. United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.").

**31.** *Reeves*, 530 U.S. at 141, 120 S.Ct. 2097 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

[retaliation or] discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."[32] Usually, a *prima facie* case plus sufficient evidence to reject the employer's explanation will suffice without more to overcome a motion for summary judgment or judgment as a matter of law.[33] But the emphasis is on the need for *evidence:* "As courts are not free to second-guess an employer's business judgment, a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding an employer's articulated reasons for its decisions."[34]

### B.

For the sake of argument, though it is debatable, we shall assume there was sufficient evidence that Furline recommended Morrison's suspension for retaliatory or discriminatory reasons. We also shall assume that, in making his recommendation, Furline was "acting in the interest of" Howard University, and hence that he falls within the definition of an "employer" contained in the DCHRA.[35] Nevertheless, Furline was not the decisionmaker. Nor

were his fellow supervisors or their immediate superior, Zachariah. While those individuals forwarded the recommendation for Morrison's suspension up the line, the decision was made at a higher level—by the Assistant Director of Human Resources in conjunction with other senior officials. For Morrison to prevail, therefore, the record must contain evidence that either (1) the actual decisionmakers had retaliatory or discriminatory reasons for suspending her, or (2) their decision was tainted by Furline's involvement or influence.

Morrison does not claim, and there is no evidence in the record to show, that the senior officials who imposed her five-day suspension did so on a pretext, or for any reason besides the one given. The stated grounds for Morrison's suspension were hardly gossamer. Management demonstrably had attempted to remedy persistent problems of unsatisfactory time and attendance in the hospital emergency room. Under the collective bargaining agreement, Morrison's suspension was justified by her unexcused absence from work, in light of her overall unsatisfactory attendance and prior disciplinary record. Nor is there record support for a finding that any of the actual decisionmakers had impermissible reasons to discipline Morrison. Indeed, so far as appears, they could not have had a motive to retaliate because they were not even aware of her age discrimination complaint against Furline.[36]

---

**32.** *Brown,* 339 U.S.App. D.C. at 245, 199 F.3d at 458.

**33.** *See Reeves,* 530 U.S. at 147–49, 120 S.Ct. at 2109–10.

**34.** *Brown,* 339 U.S.App. D.C. at 245–46, 199 F.3d at 458–59 (quoting *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988)) (internal quotation marks and brackets omitted).

**35.** *See* D.C.Code § 2–1401.02(10) (2007 Repl. Vol.).

**36.** "Employer awareness" of the protected activity is "essential to making out a *prima facie* case for retaliation." *Howard Univ. v. Green,* 652 A.2d 41, 46 (D.C.1994). Constructive knowledge is not enough; the "employee must show that the decision-makers responsible for the adverse action had actual knowl-

Similarly, there is no evidence they treated Morrison differently from younger, similarly situated employees, or otherwise manifested a discriminatory animus based on age.

Morrison relies on the alternative theory of liability, which is commonly referred to as a subordinate bias theory. The Supreme Court implicitly approved such a theory in *Reeves*, where the company president followed the recommendation of the director of manufacturing (who also happened to be her husband) and two vice-presidents to discharge the plaintiff employee for *intentionally falsifying company pay records*. The Court held that the company was not entitled to judgment as a matter of law on the employee's age discrimination claim in view of evidence, *inter alia*, that the director of manufacturing not only was "motivated by age-based animus," but also had generated misleading data to justify the termination, was "principally responsible for [the employee's] firing," and was "the actual decisionmaker" even though it was his wife who made "the formal decision." [37]

In the absence of further guidance from the Supreme Court, the federal courts of appeals have articulated varying standards for determining whether an otherwise permissible adverse personnel decision is infected by the involvement of a biased subordinate. The United States Court of Appeals for the Fourth Circuit, adhering to the Supreme Court's focus in *Reeves*, has held that "an aggrieved employee who rests a discrimination claim . . . upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer." [38] This rather strict requirement is met by evidence that "a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation" of a biased subordinate.[39]

More broadly, other federal circuit courts have held that less complete control over an employment decision by a biased subordinate may still give rise to liability. The courts typically have framed the inquiry in causal terms, looking to whether the subordinate's influence and participation undermined the independence and integrity of the decisionmaking process. The United States Court of Appeals for the Ninth Circuit, for example, has held "that to establish the essential element of causation in a subordinate bias case—where the investigation that led to the adverse employment decision was initiated by, and

---

edge of the protected activity." *McFarland*, 935 A.2d at 357.

37. *Reeves*, 530 U.S. at 151–52, 120 S.Ct. at 2111. One witness testified that the director of manufacturing "had exercised 'absolute power' within the company for 'as long as [he] can remember.'" *Id.* at 152, 120 S.Ct. at 2111 (brackets in original).

38. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir.2004) (en banc).

39. *Id.* at 290. The "cat's paw" and "rubber stamp" metaphors are frequently used to characterize subordinate bias liability:

In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action. The "rubber stamp" doctrine has a more obvious etymology, and refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate.

*Equal Employment Opportunity Comm'n v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir.2006) (citations omitted).

would not have happened but for, the biased subordinate—the plaintiff must show that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or the investigation leading thereto." [40] As this statement implies, and as the United States Court of Appeals for the Tenth Circuit has stressed, the critical question is not whether a biased subordinate had *input*, but whether he had *impact*:

> To prevail on a subordinate bias claim, a plaintiff must establish more than mere "influence" or "input" in the decision making process. Rather, the issue is whether the biased subordinate's dis-

criminatory reports, recommendation, or other actions caused the adverse employment action. [41]

The requisite causation is present where, for instance, a review committee or other formal decisionmaker relies on a subjective evaluation or misinformation supplied by the biased low-level supervisor.[42]

Conversely, "because a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action," the federal circuit courts uniformly agree that "an employer can avoid liability by conducting an independent investigation of the allegations against an employee." [43] "In that event," the Tenth Circuit points out,

**40.** *Poland v. Chertoff,* 494 F.3d 1174, 1184 (9th Cir.2007); *see also, e.g., Lust v. Sealy, Inc.,* 383 F.3d 580, 584–85 (7th Cir.2004) (reiterating that liability may attach where a biased subordinate is able to "manipulate" or "influence" the process of decision) (citations omitted); *Abramson v. William Paterson College,* 260 F.3d 265, 286 (3d Cir.2001) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate."); *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir.2000) ("If the employee can demonstrate that others had influence or leverage over the official decisionmaker ... it is proper to impute their discriminatory attitudes to the formal decisionmaker."); *Griffin v. Washington Convention Ctr.,* 330 U.S.App. D.C. 81, 85, 142 F.3d 1308, 1312 (1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence.").

**41.** *BCI Coca–Cola Bottling Co.,* 450 F.3d at 487 (explaining that "[w]hen a biased subordinate merely plays a peripheral role, it cannot be said that he has 'accomplish[ed]' a tortious act and 'cause[d] harm' as required under agency law principles and, accordingly, under Title VII.") (quoting *Restatement (Second) of Agency* § 219(2)(d) & cmt. e.) (brackets in original quotation); *see also Poland,* 494 F.3d at 1181–82 (rejecting "a simple 'but for' causation test," under which liability would attach "any time a biased employee ... sets in motion the pro-

cess that leads to an adverse employment action, ... even if the employer then conducted an entirely independent inquiry and decisionmaking process insulated from the animus of the biased employee, and no matter how compelling nondiscriminatory grounds for taking the adverse employment action").

**42.** *See, e.g., Griffin,* 330 U.S.App. D.C. at 84, 142 F.3d at 1311 (evidence of influence found where decisionmaker's "dependence upon [subordinate's] opinion was heightened by her inability independently to assess Griffin's technical proficiency"); *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1323 (8th Cir.1994) ("[A]n employer cannot escape responsibility for [ ] discrimination ..., when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [a protected class].") (citations omitted); *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) ("Lehnst not only set up Shager to fail by assigning him an unpromising territory but influenced the [review] committee's deliberations by portraying Shager's performance to the committee in the worst possible light.... A committee of this sort, even if it is not just a liability shield invented by lawyers, is apt to defer to the judgment of the man on the spot.").

**43.** *BCI Coca–Cola Bottling Co.,* 450 F.3d at 488; *see, e.g., Poland,* 494 F.3d at 1183

the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated. Indeed, ..., simply asking an employee for his version of events may defeat the inference that an employment decision was ... discriminatory.... Employers therefore have a powerful incentive to hear both sides of the story before taking an adverse employment action against a member of a protected class.[44]

An employee will be hard pressed to "claim that a firing [or disciplining] authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity to respond to and rebut the evidence supporting the recommendation."[45]

■ The foregoing principles were developed under Title VII and related federal civil rights laws, but we think they are applicable to, and appropriate for, employment discrimination and retaliation actions under the DCHRA as well. The pertinent issue under our local law is whether the employer took an adverse personnel action "for a discriminatory [or retaliatory] reason."[46] That standard is met when the action is induced by and effectuates the illicit design of a lower-level supervisor, even if the implementing officials are an unwitting conduit. On the other hand, the standard is not met when the deciding authorities independently determine that the action is warranted for permissible reasons, even if the catalyst for their review was the report by a biased subordinate.

In the present case, it was the allegedly biased Furline who initiated the recommendation that Morrison be suspended, but that by itself is not enough to taint the ultimate decision. There is no evidence that Furline influenced the decisionmakers by furnishing misinformation to them or otherwise.[47] As far as the evidence shows, senior officials decided that Morrison's suspension was warranted based solely on an independent review of the charges against her, and only after hearing her side of the story. Indeed, given a chance to be heard, Morrison did not contest the accuracy or the sufficiency of the data on which her proposed suspension was predicated, nor did she claim that Furline's recommendation was made with ulterior motives.[48] On this record, no jury reason-

("[I]f an adverse employment action is the consequence of an entirely independent investigation by an employer, the animus of the retaliating employee is not imputed to the employer"); *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir. 1997) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant."); *Griffin* 330 U.S.App. D.C. at 84, 142 F.3d at 1311 (same); *Long v. Eastfield College,* 88 F.3d 300, 307 (5th Cir.1996) ("If Aguero based his decisions on his own independent investigation, the causal link between Clark and Kelley's allegedly retaliatory intent and Long and Reavis's terminations would be broken.").

**44.** *BCI Coca–Cola Bottling Co.,* 450 F.3d at 488 (citations omitted).

**45.** *English v. Colo. Dep't of Corrections,* 248 F.3d 1002, 1011 (10th Cir.2001); *see also Hill,* 354 F.3d at 293–94.

**46.** D.C.Code § 2–1402.11(a).

**47.** We discount the testimony that Furline misinformed Zachariah about trying to contact Morrison on Memorial Day, see note 3, *supra,* for Zachariah was not one of the actual decisionmakers. There is no testimony that Furline told anyone else he had tried to reach Morrison.

**48.** Arguably, "it was incumbent upon [Morrison] to dispute any basis for the [suspension] at that time if she intended to complain la-

ably could attribute the upper-level decision to suspend Morrison to Furline's bias or find that the stated reason, Morrison's absence from work, was a pretext for discrimination or retaliation.

We therefore conclude that Furline and Howard University were entitled to summary judgment on Morrison's claim of age discrimination, as the trial court held, and to judgment as a matter of law on her

claim of retaliation. Notwithstanding the jury's verdict, we remand for entry of judgment in the defendants' favor.

*So Ordered.*

---

ter." *Hill,* 354 F.3d at 294 (citation omitted). However, we may assume for purposes of this appeal that Morrison's lawsuit was not barred by her failure to present her claims of discrimination and retaliation to the Office of Human Resources.