*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CV-989

GODWIN UKWUANI, APPELLANT,

V.

DISTRICT OF COLUMBIA,
MELINDA BOLLING,
and
LYNN UNDERWOOD, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-6886-15)

(Hon. Jennifer A. DiToro, Trial Judge)

(Argued October 8, 2019                    Decided November 19, 2020)

*David A. Branch* for appellant.

*Sonya L. Lebsack*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for appellees.

Before GLICKMAN, BECKWITH, and MCLEESE, *Associate Judges*.

GLICKMAN, *Associate Judge*:  Appellant Godwin Ukwuani, a Nigerian-born, African American male, was terminated from his employment at the District of

Columbia Department of Regulatory Affairs (DCRA) in June 2015. Following his termination, Mr. Ukwuani sued appellees—the District of Columbia, his former DCRA Director Melinda Bolling, and his former supervisor, Lynn Underwood—in Superior Court for violations of the District of Columbia Human Rights Act (HRA)[1] and the District of Columbia Whistleblower Protection Act (WPA).[2] Appellant alleged that, during his tenure at DCRA, he was reprimanded by Mr. Underwood and ultimately fired by Ms. Bolling because of his race and national origin, and in retaliation for his having complained about unlawful discrimination at DCRA and gross mismanagement and substantial and specific dangers to public safety. He also alleged that appellees had subjected him to a hostile work environment because of his race and national origin. The trial court granted summary judgment to appellees on all of these claims.

On appeal, appellant contends that the court erred in disposing of his claims on summary judgment. He presents three overarching claims for our review. First, appellant claims, the trial court erred by ignoring evidence of Bolling and Underwood's bias and the allegedly pretextual nature of the reason given for his

---

[1] D.C. Code §§ 2-1401.01–1404.04 (2016 Repl. & 2020 Supp.).

[2] D.C. Code § 1-615.51 *et seq.* (2016 Repl.).

termination, which was sufficient to allow his intentional discrimination and hostile work environment claims to proceed. Second, appellant claims, the court erroneously rejected his HRA retaliation claims for failure to show that he engaged in protected activity and without taking into account evidence that Bolling and Underwood were aware of complaints he had made regarding racial and national origin discrimination. Third, appellant contends that the court erred in similarly concluding that he failed to establish a *prima facie* case of retaliation under the WPA.

Our independent review of the record persuades us that appellant's arguments are not well taken, and that the trial court properly granted summary judgment to appellees on all his causes of action. We affirm the entry of judgment for appellees.

**I.**

**A. Appellant's Position Within DCRA**

Appellant began working at DCRA in 1999 as a general mechanical engineer in its Permit Operations Division (POD). The POD issues permits for all District building constructions and modifications. The title of "engineer" in

appellant's position at the POD may be misleading. Although appellant had a master's degree in mechanical engineering, the position description did not require an engineering license (which appellant did not have) and the job mainly involved reviewing building permit applications submitted by architects and professional engineers to ensure their compliance with the requirements of the District's construction codes. However, the position description also stated that reviewers are expected to "exercise[] independent judgment on the acceptability of plans," indicating that the job might involve more than just confirming code compliance.

Appellant generally received positive performance reviews during his tenure with the POD, and in 2014 he was promoted to the managerial position of Supervisory Mechanical Engineer in POD's Mechanical/Plumbing Section. This was an at-will position, meaning that the employee's termination was neither grievable nor appealable.

In January 2015, appellee Bolling (who is African American) was named the Director of DCRA. Previously she had been the Department's General Counsel. The following month, appellee Underwood (who is white) became the Deputy Chief Building Official of DCRA, a position with oversight responsibility for the POD, including appellant.

**B. Appellant's Disagreements with DCRA Management Regarding Qualifications for Plan Reviewers**

According to Bolling, upon her elevation to Director she was charged by the Mayor with improving the speed and efficiency of the POD by directing permit reviewers, like appellant, to limit their review to whether plans complied with the District's building codes and refrain from otherwise evaluating or commenting on plan designs.[3] In March 2015, the POD recruited for a Chief Structural Engineer. Cognizant of the Mayor's emphasis that POD should focus on code review, Bolling encouraged Gary Englebert, a white man, to apply for the position. Bolling had worked with Englebert before and, as she testified in her deposition, she "knew he had done code review in other jurisdictions." Englebert's qualifications also included expertise in the interpretation of the District's building code and numerous International Code Council (ICC) certifications.[4] Bolling ultimately selected Englebert for the position over Benjamin Johnson, an African

---

[3] As Director Bolling explained in her deposition testimony, "the decision was that the job you're performing [in the POD] is plan review and not engineering. You're not designing anything. You're reviewing plans that have already been designed by a design professional licensed in the District, and you're confirming that they comply with the code that's in effect. But we can't have you redesigning work from a licensed professional in the industry."

[4] The ICC has promulgated model construction codes, ten of which the District has incorporated into its building code. *See* 12 DCMR § 101A.

American man with a lengthy tenure at the POD and an engineering degree. Bolling made the hiring decision after a review panel found both applicants highly qualified and eligible to fill the position in light of their high review scores.[5] Bolling chose Englebert over Johnson, she said, because of Englebert's code review background and superior code review qualifications.

Appellant disagreed with Bolling's decision. Although he was not informed of Englebert and Johnson's rankings in the application process, he believed Johnson was more qualified to be made Chief Structural Engineer because Johnson also knew the District's building code, appellant thought highly of his work, and it was appellant's view that the position should be filled by an applicant with an engineering degree. He orally complained to Underwood about the decision and said he felt that Johnson was more qualified and had been treated unfairly because he was African American. He added that other plan reviewers opposed Englebert's selection as well. Bolling was aware of appellant's dissatisfaction with her hiring decision and his belief that it was racially motivated.

---

[5] In the hiring process, Mr. Johnson received an "applicant score" of 98 and Mr. Englebert received a score of 96; these exceeded the scores of the other applicants. Nothing in the record discloses what the two-point difference between the high scores was based on, or suggests that the difference was significant.

Appellant alleges that after Englebert was hired, Underwood discontinued his regular meetings with the other POD managers, all of whom were African American or Asian American, and spoke more frequently with Englebert.

This was not the first time appellant expressed opposition to the Department's changing views of the plan reviewer role and qualifications. Two years earlier, in 2013, the DCRA's Chief Building Official, Rabbiah Sabbakhan, proposed to hire additional plan reviewers to fill a new position in the POD at the GS-13 level that would be called "inspector" rather than "engineer." The minimum qualifications for this "inspector" position included several ICC certifications and an associate's degree in engineering, architecture, or construction technology.

A group of foreign-born POD GS-12 plan reviewers with engineering degrees, including appellant, met with Sabbakhan and Bolling (who was then DCRA's General Counsel) to voice objections to the "inspector" position and their status in relation to it. At that meeting, they requested a GS level increase on the grounds that their pay was not comparable to that of engineers in other District agencies and that the "inspector" position offered a higher salary but required a less advanced degree. The group wrote a follow-up letter asserting that the

proposed "inspector" position did not require the necessary qualifications for the performance of plan reviewing tasks, and that the disparity in pay between their "engineer" positions and the new position was unfair given that they had bachelor's and master's degrees. The objectors did not mention their race or national origin in the meeting or in the letter; there is no evidence in the record that appellant or any other GS-12 engineer complained to Sabbakhan or Bolling that the anticipated pay differential or change in their status or professional responsibilities was meant to discriminate against them, or would have the effect of doing so, on a racial or national origin (or other invidious) basis. One of the objecting plan reviewers, Tesfaye Habte, was deposed and testified that he "d[id]n't remember saying . . . [or] participating in . . . a complaint about Caucasian and non-Caucasian . . . as such, but we've complained about the differences in grade, and if it turns out that the difference in grade is a color difference as well, I don't know."

Sabbakhan and Bolling were not persuaded by the objections. They were of the view that the POD plan reviewer position could not be compared with engineering positions in other departments because plan reviewers did not do engineering work; rather, they focused narrowly on whether construction and

building plans met code requirements. The new "inspector" position was approved with the proposed educational requirements.[6]

## C. Appellant's Relationship with Underwood

Underwood was appellant's direct supervisor from the time Underwood joined the DCRA in February 2015 until appellant was terminated in June 2015. By all accounts, they did not have a positive working relationship. Appellant contends the friction began early in Underwood's tenure, when Underwood "mocked" the experience of the GS-12 plan reviewers during a meeting with appellant, by remarking that he could "pose five code questions to them and bet they could not answer correctly." Appellant believed the remark was indicative of Underwood's general contempt for the plan reviewers he managed, all of whom were, like appellant, foreign-born or non-white employees. In depositions, other plan reviewers recalled Underwood as a supervisor who often lost his temper, yelled at employees, and was generally demeaning or "nasty." None of them attributed Underwood's unpleasant attitude to racial or national origin bias or prejudice, however.

---

[6] On April 27, 2015, Sabbakhan forwarded the POD plan reviewers' 2013 complaint letter to Underwood, with the message "FYI."

Meanwhile, Underwood criticized appellant for not performing his managerial duties; according to Underwood, appellant "simply continued to do plan review," allowed plans to get behind, and failed to correct behavior and erroneous building code calls by some plan examiners. Underwood communicated those criticisms to appellant by, as he put it, "verbal disciplining." Underwood also formally reprimanded appellant in a so-called Letter of Counsel on April 13, 2015, in connection with an incident in which appellant sought to review certain employment applications that Underwood had rejected because the applicants did not have ICC certifications or plan review experience. In the letter, Underwood characterized appellant's conduct as an act of "insubordination." The letter further criticized appellant's performance as "less than managerial," citing his vocal opposition to Englebert's hiring and his siding with plan reviewers' dissatisfaction and complaints on various matters. Underwood recommended that appellant "extricate [him]self from fellow workers." Appellant refused to sign the Letter of Counsel.

**D. Appellant's Disagreements with DCRA Management Regarding Building Permit Approvals and His Termination**

Appellant also disagreed with his superiors over their policy of limiting building permit review to code compliance and their related encouragement of

expeditious approval of building plans subject to the applicant's subsequent satisfaction of conditions that would need to be met instead of requiring rounds of corrections to be made to the plans before the POD would sign off on them. Appellant expressed his dissenting views on these matters in connection with at least three building permit applications in 2015, and appellant's recalcitrance in a fourth such instance was the impetus for Bolling's decision to terminate him.

On January 26, 2015, Sabbakhan asked appellant to "note any conditions of substance" and issue the permit for a project at George Washington University that afternoon. This urgency was in response to the applicant's request, made to Bolling, that the approval be expedited. Appellant thought the permit required further discussion with the applicant and that it should have been revised, but he issued the permit as Sabbakhan directed him to do, with the list of items he thought the applicant would need to address. Appellant then sent an email to Matt Orlins, a DCRA attorney, in which he said he was "somehow uncomfortable with the instruction . . . to approve [the] application today." The email did not explain why appellant was "uncomfortable" or the substance of the revisions he deemed necessary; appellant did not claim it was dangerous to issue the permit. Orlins responded that he was "not involved" in the review and that appellant should work with his supervisor. There is no evidence in the record that either Sabbakhan or

Bolling was informed of appellant's email or that appellant pursued the matter further.

On February 20, 2015, Sabbakhan asked appellant for an update on the status of a pending permit application for a project called "Union Kitchen." It appears the Director had asked Sabbakhan for a "specific reason" why the permit had been delayed, and Sabbakhan had told her it would be resolved that day. Appellant responded that he wanted to check the direction of the building's exhaust system in the project plans, and if that information was not indicated, he would ask the applicant to correct the application. Sabbakhan rejected that approach and told appellant the issue was "not that complicated" and the permit should be approved forthwith, with any remaining issues listed as conditions to be enforced by way of a later inspection. Appellant wrote back with a general objection to the conditional approval practice, in which he expressed his views that "if the conditions were not met during construction, it would be too late and costly by the time our inspection gets to notice," and that the practice made code enforcement more difficult.

Appellant again opposed the approval of a permit in May 2015. Englebert, who had assumed the position of Chief Structural Engineer by this time, had asked

appellant to review a small residential construction permit for applicants described (by appellant) as "a white couple." Appellant told Englebert that the application was not compliant because it specified an unrealistically low construction cost of only $100. In response, the applicants (who apparently were on the scene and waiting for the permit to be issued) crossed out the $100 and wrote in $1,000, but appellant was not satisfied and refused to approve the permit because the new figure was, in his view, "just guesswork." In addition, appellant believed the project design was not compliant with zoning regulations. Appellant's actions were reported to Underwood, who allegedly yelled at him for his refusal to approve the permit.

The final incident unfolded in June, when appellant reviewed plans to renovate a basement for use as a hair salon or barber shop. On June 10, appellant had a lengthy and apparently contentious meeting with the architect for the plan, Eric Peterson. During that meeting, appellant insisted that the construction was a change to the building's use and required a separate HVAC system that would flow to the basement. Peterson disagreed with the need for that change. Appellant told him he could take the matter up with Underwood. Peterson did so, and Underwood agreed with him rather than with appellant. Later that afternoon, Peterson again attempted to secure appellant's approval of the plan with

Underwood's support. The three men discussed the issue in person, and appellant continued to insist that a separate HVAC system was required. In response, Underwood yelled at appellant and stated that nothing in the building code required the design change. This argument took place in an open space within the POD, and several other employees heard it. Appellant eventually approved the plan after his "further assessment determined that the design (arrangement) would be adequate."

The next morning, on June 11, 2015, Underwood e-mailed a request to the human resources division to take disciplinary action against appellant. He proposed a suspension and potentially termination. That same day, appellant emailed his version of the argument to Sabbakhan and Bolling, insisting that he had been right to question Peterson's plans and complaining that Underwood had verbally abused him in front of colleagues.

On June 12th, Underwood received a heated letter from Peterson complaining about appellant's handling of his application. Peterson wrote that he was "seriously inconvenienced" by the incident on June 10th; he felt he had lost a day of work to appellant's need to "prove that he was right" and have his "ego"

validated by a permit applicant. Underwood discussed the incident with Bolling, and he provided her with a copy of Peterson's letter.

Bolling terminated appellant on June 24, 2015. In her deposition, she testified that she did so because the letter "had the ring of truth," and it demonstrated appellant's "poor customer service" when his job was to "mak[e] the process better." Though Bolling said Peterson's letter was the catalyst for appellant's termination, she also stated that her decision was informed by reports from Underwood and Sabbakhan that appellant had been slow to adapt to his role as a manager of plan reviewers and resistant to the policy of focusing on code compliance without "redesign[ing] plans submitted by applicants." She maintained, however, that she had not considered termination an appropriate action against appellant until after she had read Peterson's letter.[7]

## II.

We review the trial court's grant of appellees' motion for summary judgment *de novo*, undertaking an "independent review of the record" and

_____

[7] Bolling testified that this was not the only instance in which she terminated a manager at the DCRA on account of a "customer" complaint. On a later occasion, she did it again; in that instance, the manager was white.

evaluating it in the light most favorable to appellant.[8] If we conclude there is any record evidence, after discovery, on which a jury could properly reach a verdict for appellant, we must reverse the grant of summary judgment.[9] But while appellant is entitled to "the benefit of every reasonable inference from the evidence," he is not entitled to "inferences based on guess or speculation."[10] Allegations that are unsupported or conclusory are "insufficient to establish a genuine issue of material fact to defeat the entry of summary judgment."[11]

## A. HRA – Discriminatory Termination Claim

We start by addressing appellant's claim that his termination was the result of, or motivated by, discrimination on the basis of his race or national origin. The HRA prohibits employers from taking an adverse action against their employees "wholly or partially for a discriminatory reason based upon . . . race [or] . . .

---

[8] *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 570 (D.C. 2000) (citation and quotation omitted).

[9] *Cain v. Reinoso*, 43 A.3d 302, 307 (D.C. 2012).

[10] *Vogel v. District of Columbia Office of Planning*, 944 A.2d 456, 464 (D.C. 2008) (citations and quotations omitted).

[11] *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C. 1991).

national origin."[12]   At the summary judgment stage, we typically evaluate an employee's claim of such intentional discrimination using the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*.[13]   Under that framework, the employee has the initial burden to state a *prima facie* claim, which raises a rebuttable inference of intentional discrimination that the employer may counter by articulating a legitimate, non-discriminatory rationale for the adverse action.[14]  If the employer advances such a rationale, the inference of discrimination "drops from the case," leaving the employee with the task of showing that the non-discriminatory reason provided by the employer is false and that the employer's action actually was motivated, in whole or in part, by a discriminatory reason.[15] Thus, where an employer has produced evidence of a non-discriminatory reason

---

[12]  D.C. Code § 2-1402.11(a)(1)(A) (2016 Repl. & 2020 Supp.).

[13]  411 U.S. 792 (1973); *see Hollins*, 760 A.2d at 571.

[14]  *Furline v. Morrison*, 953 A.2d 344, 352-53 & n.24 (D.C. 2008) ("Broadly speaking, to state a prima facie claim of disparate treatment discrimination, the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." (internal quotation marks omitted)).

[15]  *Id.* at 353 (quoting *Hollins*, 760 A.2d at 571).

for its actions, "we need not pause to analyze whether [appellant] made out a *prima facie* case of [discrimination] in opposing summary judgment."[16]

Appellees produced evidence that appellant was terminated for a legitimate, non-discriminatory reason—namely, his conduct in the incident that generated the Peterson letter. Therefore, the question on appeal now is whether a jury could infer that discrimination motivated appellant's termination, based on "the combination of (1) [his] *prima facie* case; (2) any evidence [he] presents to attack [appellees'] proffered explanation for [their] actions; and (3) any further evidence of discrimination[.]"[17]

The trial court found that appellant presented evidence on which a jury could find that the Peterson letter was not the sole reason for terminating him, in that Bolling also cited her conversations with Underwood and Sabbakhan regarding appellant's managerial difficulties and resistance to expediting code review. Nonetheless, the court awarded summary judgment to appellees. Appellant claims this ruling was erroneous in two respects. First, he argues that the trial court's findings regarding an alternative explanation for his termination demonstrate that

---

[16] *Id.* at 353.

[17] *Id.* at 354.

appellees' stated rationale was pretextual and that this showing of "pretext" was enough to permit a jury to infer that the real reason for his termination was discriminatory. Second, he contends that the court ignored circumstantial evidence that Underwood and Bolling harbored a racial bias against him. Neither of these contentions persuades us that a jury could properly find that Bolling terminated appellant for a discriminatory reason based, in whole or in part, on his race or national origin.

First, appellant misapprehends the significance of the court's assessment that a jury could find that Bolling had additional reasons for terminating him besides the Peterson letter. A showing by a plaintiff of a *prima facie* case and a triable issue as to the truth of the employer's proffered justification is not *always* enough to overcome a motion for summary judgment. The Supreme Court has explained that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some *other, nondiscriminatory* reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred."[18] This is such a case. What the

---

[18] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (emphasis added).

trial court perceived (and we conclude the record confirms) is simply that a jury could find additional nondiscriminatory reasons supporting appellant's termination; there is a fatal lack of evidence from which a jury fairly could infer that those were not, individually or in combination, the true reasons and that appellant's termination really was motivated or informed by discriminatory animus.

Preliminarily, we think it most doubtful that a jury reasonably could disbelieve Bolling's testimony that she terminated appellant on account of the Peterson incident merely because she acknowledged the other management concerns with appellant reported by Underwood and Sabbakhan. Bolling was definite and unwavering in her testimony that she was motivated by what she called Peterson's "extremely detailed" account of his frustrating and unpleasant experience with appellant, and that she "counted all the problems that [Peterson] had encountered as a customer dealing with someone that was supposed to [be] making the process better." The record also indicates that Bolling did not consider firing appellant before she received the Peterson letter, and that she had also terminated a white employee for similar customer service complaints. But even if we assume that Bolling was motivated at least in part by Underwood's and Sabbakhan's concerns with appellant's performance, those concerns were

themselves legitimate, non-discriminatory rationales for his termination that do not support a finding of discrimination. While appellant disputes the merits of their criticisms of him and asserts that his job continued to necessitate design review, his unsupported opinion on these matters is insufficient to raise a disputed issue of fact as to whether appellees' justifications for his termination were false.[19] On this record, there is no evidence that could lead a reasonable jury to conclude that appellees are "making up or lying about the underlying facts that formed the predicate for the employment decision."[20]

Furthermore, appellant also has not proffered other evidence from which a jury fairly could infer that the real motivations behind his termination included

---

[19] *Compare Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015) (employee's own assessment of her performance insufficient to raise a disputed issue of fact as to whether employer's justification for termination was false) *and Cain*, 43 A.3d at 315 (employee unable to show a triable issue of fact as to whether the employer's judgments of her performance were pretextual where the employee did not meaningfully dispute the facts underlying the employer's assessment) *with Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 893-94 (D.C. 2008) (plaintiff raised a factual dispute as to employer's stated rationale that he terminated the plaintiff due to his lack of English language proficiency through evidence showing (1) it was unclear that English proficiency was actually a job requirement and (2) his English was not deficient). Of course, if appellant had provided evidence to eliminate either of appellees' asserted justifications for his termination, "discrimination may well be the most likely alternative explanation;" but that is not the case here. *Reeves*, 530 U.S. at 147.

[20] *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

racial or national origin discrimination. Nothing in the record suggests that Bolling displayed or had a discriminatory animus toward appellant or any other non-white or foreign-born employee.[21] Appellant argues that even if Bolling herself was not biased, her decision to terminate him was infected by the bias of a subordinate, Underwood, on whose reports and recommendations she allegedly relied. Appellant points to three facts for which there is record support that he contends create a triable issue on Underwood's motivations. In our view, however, even assuming *arguendo* that appellant could show Underwood impacted the decision by Bolling to terminate him (as he must in order to prove he was fired because of a subordinate's bias),[22] the record demonstrates only a contentious and unprofessional relationship between appellant and Underwood. It does not support a finding that discriminatory animus underlaid the tension between them.

---

[21] Appellant's contrary argument, made for the first time in his reply brief, that the trial court ignored evidence that Bolling displayed a willingness to discriminate when she encouraged Mr. Englebert, a white man, to apply for and ultimately selected him as DCRA's Chief Structural Engineer, does not persuade us of a triable issue of fact. While a decision maker's prior discriminatory acts can be used as "background evidence in support of a [discrimination] claim," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), there is no evidence that Englebert's selection had to do with his race rather than his significant code review experience.

[22] *See Furline*, 953 A.2d at 355-56.

First, appellant argues that Underwood's disrespectful statements about the GS-12 plan reviewers, such as his disparaging remark that they could not answer questions about the building code correctly, is circumstantial evidence of discrimination. We are not persuaded. The evidence may support a picture of Underwood as an ill-tempered and offensive manager who was dissatisfied and at odds with the employees he supervised. That is not enough to support a plausible inference that Underwood was motivated by discriminatory animus. Offensive and insulting remarks need not explicitly invoke a racial (or other invidious) classification to constitute evidence of discrimination—"[t]he speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage"[23]—but the record in this case evinces no such contextual or historical link between Underwood's criticisms of his staff and his staff's race or national origin. Underwood's comments may have been rude or worse, but they related to job performance and there is no evidence showing that Underwood meant them as a racially or ethnically charged insult or that the comments were motivated by prejudice.

---

[23] *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

Second, appellant cites Underwood's criticism of him for expressing and supporting the complaints and concerns of the engineers whom he supervised as evidence of bias. This is not, however, a case in which a jury reasonably could draw the inference that Underwood harbored discriminatory attitudes and animus against appellant for his advocacy on behalf of a protected class.[24] The nub of the dispute was the agency's shift away from design review to focus on expeditious code compliance, for reasons and with consequences unrelated to the employees' membership in a protected class, and appellant's perceived failure, in his role as a manager, to support the agency's (and not his subordinates') objectives. There is no evidence that Underwood would have responded differently to appellant's support of his employees had those employees been white, and notably, no witness-employee in this case perceived Underwood's management as racially or otherwise biased.

Third, appellant cites evidence that, after Englebert was hired, Underwood stopped having regular meetings with non-white POD managers and instead primarily communicated with them through Englebert. We see little significance

---

[24] *See, e.g.*, *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1310 (7th Cir. 1985) (notation on black plaintiff's job application that he was arrested for marching in a civil rights demonstration was probative evidence of employer's discriminatory intent).

in this isolated fact. Underwood's utilization of Englebert as an intermediary may have been entirely benign and understandable, since Englebert was vested with supervisory authority over at least some other POD employees (apparently including appellant). But even if Underwood's practice was some (slight) evidence of cronyism or favoritism, it does not show that Underwood had an unlawful motivation for ending the meetings or seeking to undermine appellant because of his race or national origin.[25]

While we generally disfavor the resolution of intentional discrimination claims on summary judgment "since they almost always involve issues concerning the employer's (or supervisor's) motive or intent"[26] (generally a question "ill-suited for determination as a matter of law" and better left for the fact finder[27]), this is a case in which summary judgment is appropriate, because appellant has failed to present even circumstantial evidence of discrimination.

---

[25] *Howard Univ. v. Green*, 652 A.2d 41, 45-46 (D.C. 1994) ("[E]mployment practices such as cronyism and favoritism are not actionable under anti-discrimination statutes such as the HRA.").

[26] *Hollins*, 760 A.2d at 570-71.

[27] *In re Estate of Corriea*, 719 A.2d 1234, 1243 (D.C. 1998).

## B. HRA – Hostile Work Environment

To prevail on a hostile work environment claim under the HRA, a plaintiff must establish "(1) that he is a member of a protected class, (2) that he has been subject to unwelcome harassment, (3) that the harassment was based on membership in a protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment."[28] The trial court correctly concluded that appellant failed to submit probative evidence of at least the third prong—as discussed above, the record on summary judgment does not demonstrate that Underwood's quarrelsome relationship with appellant was based on or related to appellant's protected class status.

## C. HRA – Retaliation

The HRA prohibits an employer from retaliating against an employee "for opposing an employment practice that is prohibited by the Act."[29] To make out a

---

[28] *Nicola v. Washington Times Corp.*, 947 A.2d 1164, 1173 (D.C. 2008).

[29] *Vogel*, 944 A.2d at 463 & n.12 (citing D.C. Code §§ 2-1402.11(a), 2-1402.61(a) (2001) and noting that this court has "construed [those] statutory provisions to guarantee employees the same protection from retaliation as is provided by the so called 'opposition clause' in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) (2007)").

*prima facie* case of retaliation, appellant must establish (1) that he engaged in a protected activity; (2) that appellees took an adverse action against him; and (3) that a causal relationship existed between that adverse action and the protected activity.[30]

"Whether actions by an employee constitute protected activity is a question of law."[31]  For an activity to be "protected" under the Act, (1) it must be one in which an employee expresses a "reasonable good faith belief"[32] that their employer violated the HRA; and (2) the employer must be aware of the activity; that is, the employee must "alert the employer that [they are] lodging a complaint about allegedly discriminatory conduct."[33]

---

[30]  *See Green*, 652 A.2d at 45.

[31]  *Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779, 790 (D.C. 2001).

[32]  *Green*, 652 A.2d at 46; *see also Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012) ("An employee is protected from retaliation even if the employer's conduct alleged to be discriminatory is lawful, so long as the employee reasonably believed the employer's action was discriminatory.")

[33]  *Green*, 652 A.2d at 46; *see also Vogel*, 944 A.2d at 464 ("It is not enough for an employee to object to favoritism, cronyism, violation of personnel policies, or mistreatment in general, without connecting it to membership in a protected class, for such practices, however repugnant they may be, are outside the purview of the HRA.").

However, because appellees produced evidence that appellant was terminated for a legitimate, non-discriminatory reason, we need not fixate on whether appellant made out a *prima facie* case of retaliation.[34]  Instead, just as we did when analyzing appellant's discrimination claim, "we may proceed to answer the ultimate question": whether a jury could find that retaliation motivated appellant's termination, based on a combination of appellant's *prima facie* case, evidence rebutting appellees' proffered reasons for their actions, and any further evidence of retaliation.[35]

On appeal, appellant maintains that the trial court overlooked three instances in which he complained about racial discrimination at DCRA and thus engaged in a protected activity:  (1) his 2013 complaint regarding the creation of the GS-13 "inspector" position; (2) his efforts to present to management the concerns of the "foreign-born engineers" in the POD; and (3) his complaint that the hiring of Gary Englebert over Benjamin Johnson was racially motivated.[36]

---

[34] *Furline*, 953 A.2d at 353.

[35] See *supra* notes 16 & 17 and accompanying text.

[36]  At oral argument in this appeal, appellant identified his June 11, 2015 email communication to Bolling and Sabbakhan regarding Underwood's treatment of him during the Peterson incident as a fourth protected activity for purposes of his retaliation claim.  Out of fairness to the appellee, we generally do not consider

*(continued…)*

First, appellant contends that the evidence at summary judgment showed that he "implicitly complained of race and national origin discrimination" at DCRA when he and other foreign-born GS-12 plan reviewers objected in 2013 to the proposed GS-13 "inspector" position. The record, however, demonstrates that the GS-12 reviewers, including appellant, did not even implicitly lodge a complaint that the new position was unlawfully discriminatory. It is true that several GS-12 reviewers said in their depositions that there was a racial difference between them and the GS-13 "inspectors." But no reviewer testified that this difference was the subject of a complaint. As one reviewer testified, he "d[id]n't remember saying . . . [or] participating in . . . a complaint about Caucasian and non-Caucasian . . . as such, but we've complained about the differences in grade." And appellant, in his own deposition, described the qualifications of the GS-13 position as unfair to him and the other GS-12 reviewers because they required an ICC certification and did not privilege their advanced degrees. The letter the reviewers sent is consistent with this view.

---

*(continued...)*
a claim raised by an appellant for the first time at oral argument. *See Jung v. Jung*, 844 A.2d 1099, 1112 n.9 (D.C. 2004). At any rate, the email raises no complaint of practices prohibited by the HRA, nor does it connect Underwood's treatment of appellant to his race or national origin. It could not have alerted appellees to any unlawfully discriminatory conduct, and hence did not constitute protected activity under the HRA. *See Green*, 652 A.2d at 46.

These complaints certainly raised an objection to the disparity in pay created between their position and the GS-13 position that required no advanced degree, but "there is no sign" that appellant or the other GS-12 reviewers connected "the inequality to any difference" between their race or national origin and those who they believed would be considered for the GS-13 position.[37]  Even if appellant believed that the new position discriminated against the GS-12 reviewers because of race or national origin, his actual complaint to his employer did not reveal any such belief; thus, the 2013 complaint was not a protected activity under the HRA and it cannot support appellant's retaliation claim.

Second, appellant's argument that Underwood advocated for his termination so that appellant could no longer represent the interests of other foreign-born plan reviewers fails for the same reason—his "advocacy" was on behalf of employees who happened to be members of a protected class, but he did not link his advocacy to their national origin.  Objections to agency "policies, or mistreatment in general,

---

[37]  *Vogel*, 944 A.2d at 465 (employee could not show a protected activity where she did not link her lower pay in comparison to newly hired employees to a difference in their ages); *cf. McFarland v. George Washington Univ.*, 935 A.2d 337, 360 (D.C. 2007) (doubting that an employee's letter voicing "general dissatisfaction with the fact that he was passed over for [a] promotion" was a protected activity, though affirming award of summary judgment to employer on other grounds).

without connecting it to membership in a protected class . . . are outside the purview of the HRA."[38]

The missing connection is not supplied by an interrogatory answer cited by appellant, in which appellees concede "[u]pon information and belief" that appellant verbally complained "that African-American employees including [Mr.] Johnson were being treated unfairly" and that Director Bolling was "aware that he had complained of discrimination within DCRA." Although interrogatory answers can help establish a genuine issue of material fact,[39] not every interrogatory answer is created equally. Several circuits do not even consider interrogatory answers based "upon information and belief" when ruling on summary judgment motions, because they do not meet the requirement under Fed. R. Civ. P. 56(c)(4) that affidavits submitted in opposition to summary judgment must "be based on

---

[38] *Vogel*, 944 A.2d at 464; *cf. Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*, 614 F. Supp. 1002, 1008, 1012 (D.D.C. 1985) (evidence at trial sufficient to prove that employee engaged in a protected activity for purposes of HRA retaliation claim where she advocated for an "increase in appointments of blacks and women to high-level positions").

[39] Super. Ct. Civ. R. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record, including . . . interrogatory answers, or other materials[.]"); *Smith v. WMATA*, 631 A.2d 387, 391 (D.C. 1993).

personal knowledge."[40]  We can look to these circuits for guidance in interpreting

our local rule, Super. Ct. Civ. R. 56(c)(4), given that it is identical to its federal

counterpart.[41]  This not to say that we will not consider appellees' interrogatory

answer.  After all, it might be admissible against the defendants at trial as the

admission of a party-opponent.[42]  But admissible evidence is not necessarily

sufficient evidence; "[t]he mere existence of a scintilla of evidence in support of

the plaintiff's position will be insufficient to defeat a motion for summary

judgment."[43]

---

[40] *See Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 677 n.4 (2d Cir. 2016); *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) (citing cases in other circuits); *see also Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge.").

[41] *McAllister v. District of Columbia*, 653 A.2d 849, 853 n.9 (D.C. 1995); *see also Cormier v. District of Columbia Water and Sewer Auth.*, 959 A.2d 658, 664 (D.C. 2008) ("[W]e think that Super. Ct. Civ. R. 56 should be construed consistently with its federal counterpart.").

[42] Importantly, however, that does not mean the admission would be conclusive of the issue or irrebuttable. *See, e.g.*, *Chaabi v, United States*, 544 A.2d 1247, 1249 (D.C. 1988) (explaining that the party-opponent is entitled to "ample opportunity" at trial to deny or explain the admission (quoting MCCORMICK ON EVIDENCE § 37, at 81 (3d ed. 1984)).

[43] *Smith v. Swick & Shapiro, P.C.*, 75 A.3d 898, 902 (D.C. 2013) (quoting *Aziken v. District of Columbia*, 70 A.3d 213, 218 (D.C. 2013)).

The phrase "upon information and belief" raises sufficiency concerns, because it is nothing more than a bare profession of belief despite a lack of knowledge as to the truth of the belief. It forces us to ask what "information" the "belief" is based upon. The answer does not cite any specific documentation or other support, but appellant references two instances that purportedly corroborate it: appellant's complaint regarding the hiring of Mr. Englebert over Mr. Johnson, and appellant's "voicing [of] staff mistreatment." While the former is a claim of racial discrimination, the latter is not; the record only shows that appellant "expressed outrage with how [he] perceive[d] staff have been mistreated," not that they were being mistreated because of their race or national origin. Consequently, we conclude that even if the interrogatory answer is admissible, it is insufficient to establish that appellant complained about racial discrimination against anyone other than Mr. Johnson.

Lastly, appellant cites his complaint about the selection of Englebert over Johnson for the Chief Structural Engineer position as a protected activity.[44] It is

---

[44] Appellant does not attempt to connect this complaint to his termination, but argues that, at least partly in response to this activity, Underwood issued the Letter of Counsel against him. Because we conclude that appellant's objection to Englebert's hiring is not a protected activity, we express no view on the separate question whether the Letter was a materially adverse action under the HRA.

undisputed that appellant told Underwood he believed Johnson was more qualified for the position and that he thought the selection of Englebert was an instance of racial discrimination. Appellees argue, however, that this was not protected activity because the record shows that appellant did not have a reasonable good faith belief that discriminatory hiring occurred, and the point was not in material dispute. We agree with appellees on this point.

The "reasonable good faith belief" test is not a high bar. It asks only whether the employee *reasonably and sincerely* believed when they made the report that unlawful discrimination occurred.[45] If so, the employee is protected from retaliation even if the belief was mistaken and the employer's conduct was lawful, for the HRA's goal of rooting out workplace discrimination "relies heavily on the initiative of aggrieved employees, whose efforts in the public interest would be severely chilled if they bore the risk of [retaliation] whenever they were unable

---

[45] *See, e.g.*, *Green*, 652 A.2d at 46; *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994) ("An erroneous belief that an employer engaged in an unlawful employment practice is *reasonable*, and thus actionable . . . , if premised on a mistake made in good faith. A good-faith mistake may be one of fact or of law."); *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982) ("[I]t is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case."); *Parker v. Balt. & Ohio R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981).

to establish . . . the merits of their claims."[46]  Generally speaking, a plausible complaint that a more qualified member of a racial minority was passed over for a position in favor of a less qualified white applicant does suggest the existence of a reasonable and good faith belief that discriminatory hiring took place, even if the complainant turns out to be wrong about the relative merits of the applicants,[47] and will be sufficient to trigger the anti-retaliatory protections of the HRA.

But the context of this case distinguishes it.  For present purposes, we assume that appellant made his charge of racial discrimination in good faith.  Nonetheless, appellant did not have, and has never articulated, an objectively reasonable basis for accusing DCRA of such discrimination in selecting Englebert over Johnson to head the POD.  He failed to show a material dispute on this issue.  It is undisputed that Director Bolling made the hiring decision after a review panel found both applicants to be highly qualified and eligible to be selected by her in light of their high review scores (96 for Englebert and 98 for Johnson).  It is

---

[46]  *Parker*, 652 F.2d at 1019.

[47]  *Cf. Brown v. Nat'l Acad. of Sciences*, 844 A.2d 1113, 1123 (D.C. 2004) (employees will make out a *prima facie* case of discrimination in hiring if they can show (1) they belong to a protected class; (2) they were qualified for the position; (3) their "failure to be hired occurred despite [their] employment qualifications;" and (4) the decision not to hire them was based on their protected class status).

undisputed that she selected Englebert because of his superior code review qualifications, which was the area where supervision of the POD was deemed most needed. Appellant has pointed to no evidence that the review panel's criteria were discriminatory, or applied discriminatorily in this instance, or that Bolling's stated reason for picking Englebert was not her real reason.

Appellant's longstanding disagreement on the merits with DCRA's emphasis on code review over engineering skills in selecting a head of the POD did not provide a reasonable basis for his charge of racial discrimination. The record shows that the determination to prioritize code review skills and deemphasize engineering skills in this area was a legitimate and non-discriminatory policy decision made to address a serious deficiency in the POD's performance of its main function. Appellant has pointed to no evidence to the contrary. And appellant clearly knew that DCRA officials, including Bolling, believed code review experience was critical and that engineering skills were secondary. They had been emphasizing that policy for years; it was, after all, the subject of appellant's 2013 complaint about the GS-13 plan reviewer position—he disagreed with Bolling and Sabbakhan's view then that the POD needed reviewers with ICC certifications more than it needed them to have engineering degrees. In other words, appellant was aware that there was a legitimate, sufficient, non-

discriminatory reason for Englebert's selection, and the record does not show that appellant had a basis to dismiss that reason as pretextual.[48]

Moreover, appellant did not have (and still does not have) a sound basis to assert that Johnson was materially more qualified than Englebert. Having made no inquiry into the actual hiring process, appellant was unaware how the two applicants had been evaluated or how they scored. Their virtually identical review scores would seem to imply, if anything, that they were equally qualified to fill the position. Certainly, appellant has failed to show that the two-point difference was significant, or that it would have made his belief in discrimination any more

---

[48] Indeed, appellant proffered no evidence, other than his own unsupported opinion, that engineering degrees really were more valuable in the plan reviewer role than other qualifications, which conceivably might have lent support to a reasonable belief that Bolling had made up a pretextual basis for hiring Englebert. *See, e.g.*, *Estenos*, 952 A.2d at 893-94 (factual dispute regarding job qualifications created a triable issue of fact on whether a termination was pretextual). Nor did appellant argue to his employer that their preference for applicants with ICC certifications disproportionately excluded non-white or foreign born applicants, which might have supported a reasonable belief that DCRA's hiring policy had an unlawful disparate impact on those applicants, *see, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) ("Under the disparate-impact [theory] a plaintiff establishes a prima facie violation by showing that an employer uses a particular employment practice that causes a disparate impact on the basis of" a protected class.), and there are no facts in the record to suggest this was the case.

reasonable had he known of it.[49]  And the record indicates that both candidates had long experience, the big difference being that Englebert's experience was focused on code review, which is what the DCRA deemed most important.  At his deposition, appellant himself conceded that Englebert had acquired over thirty ICC certifications, while he did not know whether Johnson had obtained any.  There appears to be no evidence in the record that Johnson in fact had acquired any ICC certification or other accreditations testifying to his code review expertise.

In sum, an accusation of racism is a very serious charge. For it to be objectively reasonable it is not enough that it is leveled in good faith.  Such an accusation cannot be called objectively reasonable when, as here, the accuser (1) knows that the challenged decision has a genuine and legitimate non-discriminatory rationale, (2) beyond that, has made no reasonable inquiry into the merits of the decision or the process by which it was made, and (3) has no basis for accusing the decision makers of any discriminatory animus or bias.  We conclude

---

[49] At least one circuit has held that information not known to the employee *cannot* support the reasonableness of an employee's belief of employer misconduct.  *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1352 (11th Cir. 1999) (analyzing a Title VII retaliation claim).  We need not reach that issue in this case.

there is insufficient evidence that appellant reasonably believed the hiring of Englebert violated the HRA for his retaliation claim to survive summary judgment.

### D. Whistleblower Protection Act

The WPA protects District employees from "retaliation or reprisal" when they, in the public interest, "report [government] waste, fraud, abuse of authority, violations of law, or threats to public health or safety."[50] In order to state a *prima facie* WPA claim, a plaintiff must show (1) that they made a disclosure protected by the Act; (2) that a supervisor "took or threatened to take a prohibited personnel action" or otherwise retaliated against them; and (3) that the protected disclosure "was a contributing factor to the retaliation or prohibited personnel action" (i.e. the protected disclosure and the prohibited personnel action are causally connected).[51]

A "protected disclosure" is defined to include (as pertinent here) "any disclosure of information . . . to any person by an employee . . . that the employee reasonably believes evidences," among other things, "gross mismanagement," a "violation of federal, state, or local law, rule, or regulation," or a "substantial and

---

[50] D.C. Code § 1-615.51 (2016 Repl.).

[51] *Wilburn v. District of Columbia*, 957 A.2d 921, 924 (D.C. 2008).

specific danger to the public health and safety."[52]  The employee must hold such a belief at the time the whistle is blown, and the belief must be both sincere and objectively reasonable.[53]  Appellant claims he made protected disclosures that supported his WPA retaliation claim by (1) objecting to or refusing to approve the permit applications described above by GWU, Union Kitchen, Mr. Peterson, and a "white couple;" (2) complaining that Englebert was hired unlawfully; and (3) complaining about the GS-13 "inspector" position.

In granting summary judgment to appellees, the trial court concluded that appellant had failed to proffer sufficient evidence from which a jury could find that he stated a *prima facie* case under the WPA.  Specifically, the court ruled that (1) appellant did not make protected disclosures when he objected to three of the permit approvals and charged that Englebert had been hired unlawfully; and (2) appellant had not established that either his 2013 complaint regarding the GS-13 "inspector" position or his January 2015 complaint concerning the GWU permit

---

[52]  D.C. Code § 1-615.52(a)(6) (2016 Repl.).

[53]  *See Freeman v. District of Columbia*, 60 A.3d 1131, 1143 (D.C. 2012); *Johnson (Nancy) v. District of Columbia*, 225 A.3d 1269, 1276 (D.C. 2020) ("Plaintiffs . . . must show that they had a reasonable and genuine contemporaneous belief that the actions they disclosed rose to the level of seriousness required under the DCWPA.").

(assuming they were protected disclosures) was linked to a retaliatory or adverse personnel action. Appellant argues that all those rulings were incorrect as a matter of law, and that his WPA claim therefore should proceed to trial. For the following reasons, we are not persuaded to reverse the trial court's judgment in favor of appellees on this claim.

## 1. Appellant's Alleged Protected Disclosures

Appellant argues that his objections to approving the plans submitted by Peterson, Union Kitchen, and the "white couple" were protected disclosures that raised issues of gross mismanagement, "violations of D.C. rules," and a substantial and specific danger to public safety. He maintains that approving construction permits in those instances without first requiring design or other changes meant approving plans with dangerous flaws and prevented the department from resolving code violations before construction on a project began.

We assess the reasonableness of appellant's belief under the "disinterested observer test," which asks whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably

[could] conclude that the actions of the government evidence illegality?"[54] This analysis does not "hinge[] upon whether the [action] was ultimately determined to be illegal," but it does require that the employee's belief be objectively reasonable and that the employee has not ignored essential facts, including those "which detract[] from a 'reasonable belief.'"[55] "In other words, the fact finder must consider whether the employee reasonably should have been aware of information that would have *defeated* his inference of official misconduct."[56]

While appellant frames his complaints regarding the permits as sounding an alarm about the risks of the agency's focus on code compliance review rather than design evaluation, the record does not support a finding that appellant had a "reasonable and genuine contemporaneous belief" that the approvals in question posed real safety concerns to the District or meaningfully impeded POD's ability to regulate building construction and modification.[57] He conceded to his

---

[54] *Freeman*, 60 A.3d 1131, 1151 (D.C. 2012) (quoting *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-60 (D.C. 2003) (alterations omitted). This court adopted the "disinterested observer test" from federal authorities interpreting the "similarly worded" federal WPA. *See Zirkle*, 830 A.2d at 1260 n.13.

[55] *Freeman*, 60 A.3d at 1152.

[56] *Id.* (emphasis in original).

[57] *Johnson (Nancy)*, 225 A.3d at 1276.

supervisors, for example, that his "further assessment determined" Peterson's basement design to be "adequate," belying his contention on appeal that the design, or the process by which it was approved, was unsafe.[58] And his complaints regarding the Union Kitchen permit and the "white couple's" residential construction permit merely raised vague concerns that conditional approvals would prove "costly" (to whom, it is unclear) to correct and that "guesswork" in a private individual's own construction costs would somehow cheat the government.[59]

Appellant opposed an agency policy that favored performing an expeditious code review, noting issues of substance, and approving the permits conditioned on making the code corrections identified in the review. This was a policy about

---

[58] Appellant raises the additional argument that the basement needed a separate ventilation system according to District law. He has cited no law or regulation to us indicating that is the case, and both his supervisor and Peterson clearly disagreed with his interpretation. On this record, the dispute appears to be nothing more than a "[d]ebatable difference[] of opinion," and thus does not rise to the level of a protected disclosure. *District of Columbia v. Poindexter*, 104 A.3d 848, 855 (D.C. 2014).

[59] These complaints stand in marked contrast to the authorities appellant cites as support for his contention that he made protected disclosures about the safety and soundness of POD's permitting policies. In those cases, plaintiffs raised specific complaints about the "serious and potentially life-endangering problems" with a manager's response to a fire, *see Coleman v. District of Columbia*, 794 F.3d 49, 58 (D.C. Cir. 2015), or reported such waste of funds that a jury could conclude that a District project was "just burning money," *see Williams v. Johnson*, 776 F.3d 865, 871 (D.C. Cir. 2015).

which reasonable people can disagree; in fact, appellees argue that the policy is consistent with that of other jurisdictions. A mere policy disagreement with an agency or supervisor is not enough to show either gross management or a substantial and specific danger to public safety; an employee "must disclose such serious errors by the agency that a conclusion that the agency erred is not debatable among reasonable people."[60] Appellant's "purely subjective perspective" on the agency's permitting process is insufficient for a reasonable jury to conclude that he made a protected disclosure under the WPA.[61]

Appellant further argues that he presented evidence sufficient to establish that when he complained to Underwood about the Englebert hiring, he reasonably believed the hiring decision was racially motivated or an act of preferential treatment and a violation of District law. Our reasons for rejecting this contention overlap with our reasons for rejecting his similar HRA retaliation claim. Appellant's claims of racial discrimination and preferential treatment in the Englebert hiring do not pass the disinterested observer test, because the objective merits of Englebert's hiring were either known or "readily ascertainable" to

---

[60] *Johnson (Nancy)*, 225 A.3d at 1275 (quoting *Wilburn*, 957 A.2d at 925).

[61] *Poindexter*, 104 A.3d at 858 (quoting *Zirkle*, 830 A.2d at 1260).

appellant. As previously discussed, at the time of his selection, appellant knew that the DCRA was moving in a direction that privileged Englebert's code expertise and background. Appellant's assertion that Johnson was clearly more qualified was out of touch with a disinterested observer's view as to whom the agency reasonably and fairly could hire.

### 2. "Disclosures" Regarding the GS-13 "Inspector" Position and the GWU Permit Approval

Appellant characterizes as protected disclosures his communications with Bolling and Sabbakhan in which he opposed the creation of the new GS-13 "inspector" position, and his email to DCRA attorney Matt Orlins stating that the GWU permit made him "somehow uncomfortable." The trial court assumed *arguendo* that these complaints were protected disclosures, but concluded that appellant had failed to show that they contributed to any prohibited personnel action taken against him. While we doubt a jury could find either was a protected disclosure,[62] we affirm the award of summary judgment on the grounds on which the trial court relied.

---

[62] As discussed above, there is no record support for appellant's claim that his opposition to the GS-13 position was a protected disclosure because it raised an issue of disparate treatment of POD reviewers based on their national origin. And appellant's email stating that he was "somehow uncomfortable" with a

*(continued…)*

The two-year lapse between appellant's complaints regarding the creation of the GS-13 position and his termination is fatal to his argument that those events were linked,[63] and while the record shows that Underwood was made aware of the 2013 complaint by April 27, 2015, there is no evidence that the Letter of Counsel (given to appellant on April 13, 2015), appellant's termination (which occurred two months later), or any other reprimand by Underwood bore any relation to appellant's 2013 advocacy.

As for appellant's email about the GWU permit, the trial court correctly concluded that there was no causal connection between it and any prohibited personnel action, because there is no evidence that appellees were aware of the disclosure.[64] Appellant sent his email only to Mr. Orlins, and Bolling could not

_____

*(continued...)*

supervisor's directive to approve a particular permit application was in all likelihood too vague to alert its addressee that appellant believed there was gross mismanagement or a substantial and specific danger to public safety.

[63] *See Freeman*, 60 A.3d at 1144-45 (noting that "while the temporal proximity of an adverse personnel action to a protected disclosure may lend support to an inference of a causal relationship, 'a stretch of over two years realistically cannot constitute temporal proximity in the ordinary sense of that phrase'") (quoting *Johnson (Michelle) v. District of Columbia*, 935 A.2d 1113, 1120 (D.C. 2007)).

[64] *See, e.g. Freeman*, 60 A.3d at 1144 (no causal connection between alleged retaliatory act and alleged disclosure, because the disclosure took place

*(continued...)*

recall speaking with Orlins. Appellant's argument that it is "unlikely" that she would not have known of this email is unsupported and "based on guess or speculation."[65]

### III.

For the foregoing reasons, we affirm the trial court's grant of summary judgment to appellees.

---

*(continued...)*
*after* the agency action); *Williams v. Johnson*, 701 F. Supp. 2d 1, 20 (D.D.C. 2010) (awarding summary judgment to the District on a WPA claim because the plaintiff failed to present evidence that it knew of her meeting with a D.C. Councilmember regarding alleged retaliatory acts the District took after she testified before the Council).

[65] *Vogel*, 944 A.2d at 464 (D.C. 2008) (citations and quotations omitted).