*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-745

TODD ROSE, APPELLANT,

v.

UNITED GENERAL CONTRACTORS, *et al*., APPELLEES.

Appeal from the Superior Court of the
District of Columbia
(CAB-8899-18)

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Argued May 26, 2022                    Decided November 17, 2022)

*Denise M. Clark*, with whom *Jeremy Greenberg* was on the brief, for appellant.

*Reshad D. Favors* for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Todd Rose appeals the trial court's judgment, after a bench trial, on the merits of his claims of retaliation and discrimination under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 et seq. In December 2018, appellant filed a complaint in D.C. Superior Court alleging that his employer, United General Contractors ("UGC"), and the

business's owner, Nathaniel Lewis (hereinafter "appellees"), violated the DCHRA by terminating him due to his disability of Parkinson's disease and/or in retaliation for requesting accommodations. Appellant argues that the trial court erred by 1) concluding that appellant could not establish a claim of discriminatory retaliation, and 2) failing to conclude that appellees acted with a discriminatory motive in terminating his employment. We reverse and remand: 1) for the trial court to determine whether, as relates to the retaliation claim, the November 13, 14, or 15 emails constituted protected activity; and 2) for the trial court to determine, as relates to the discrimination claim, whether appellant was terminated, in part, based on his disability.

## I. Factual Background

The following facts appear to be undisputed unless otherwise noted. In February 2017, appellees hired appellant to be their first-ever Glazing Field Superintendent. UGC had recently secured a high-profile contract to renovate the Marie Reed elementary school in the Northwest quadrant of D.C., and the project needed a superintendent to coordinate and oversee day-to-day glazing operations. As Glazing Field Superintendent, appellant was responsible for all portions of the project related to glass and glazing. Appellant was charged with communicating

between UGC and Gilbane (the general contractor on the jobsite), ordering materials, maintaining oversight of field staff, conducting quality control, and ensuring projects were executed within budget and on time.

At the time appellant was hired, appellees were aware that he had Parkinson's disease. In the first few months of his employment, appellant excelled in his position, and Gilbane representatives complimented his work. However, in the months that followed, his performance declined. Gilbane representatives sent appellees several emails about incorrect and late installations. During the same period, appellant began to experience more frequent medical issues, such as increased falls, due to an issue with an implant that distributed his medication. On at least one occasion, appellant was late to work because he needed to reset the battery on his implant.

In July 2017, UGC union liaison Bob Arbour and UGC's owner, Mr. Lewis, had a discussion with appellant about changing positions to become a project manager, which is an office job that does not require field site visits. Following the discussion, Mr. Arbour emailed Mr. Lewis and UGC's Vice President, Casey Gwei, the following:

> I just finished talking with Todd about Safety and being
> on the project. He has agreed that his time in the field full

> time has come to a close[.] We discussed being a project manager and he is willing to make the transition[.] Pay and benefits will need to be reviewed and agreed upon[.]

However, appellant later declined the position change. Gilbane representatives continued to raise concerns about the Marie Reed project until they eventually froze payments to UGC "until resolution of outstanding items [could] be identified."

On November 13, 2017, Mr. Arbour emailed appellant to inform him that he needed to provide UGC's insurance company with "a current medical clearance . . . to confirm [his] fitness for duty" by November 17, 2017. On November 16, appellant's doctor wrote a note indicating that appellant "is not to do any physical labor" and "may experience 'on and off' time several times a day." On November 17, appellees gave appellant a letter stating that he had been laid off because UGC decided to eliminate his position and delegate the functions to the lead foremen on each project. Within the year, appellees hired a new Glazing Field Superintendent.

Appellant filed a complaint in D.C. Superior Court in December 2018, alleging that appellees violated the DCHRA by retaliating against him and terminating his employment because of his disability. Appellant moved for partial summary judgment asserting that he had made out a prima facie case of disability

discrimination and retaliation. In response, appellees filed a cross-motion for summary judgment asserting that appellant's discrimination and retaliation claims failed as a matter of law. Appellees' cross-motion asserted that they had multiple, legitimate reasons for terminating appellant, including violations of time and attendance policies, poor job performance, and lack of work. The cross-motion also asserted that appellant could not prove that his termination was in retaliation for requesting accommodations because the temporal proximity between appellant's submission of his doctor's note and his termination was "nothing more than coincidence." In opposition to appellees' cross-motion, appellant noted that, despite appellees' assertion that he was terminated for performance and attendance issues, his termination letter stated, "[T]his layoff is not a statement about your work for United General Contractors. You have been a dedicated, contributing employee for nearly one year." Additionally, appellant noted that, while appellees asserted that appellant's position was eliminated due to lack of work, there was evidence that appellees began to look for someone to fill appellant's position shortly after appellant's termination.

The trial court granted appellant's motion for summary judgment in part, ruling as a matter of law that: 1) appellant has Parkinson's disease; 2) appellant was qualified for the Glazing Field Superintendent position; 3) appellant engaged in a

protected activity by submitting the doctor's note requesting accommodations for his disability; and 4) appellant's termination was an adverse action. The trial court noted that there was a genuine issue of material fact pertaining to the date on which the doctor's note was submitted, i.e., whether it was before or after appellees decided to lay him off. The trial court denied appellees' motion for summary judgment because appellant "presented a prima facie case of discriminatory termination and retaliation that a jury might credit" and "proffered significant probative evidence tending to support his contention that [appellees'] stated decision to terminate him was pretextual."

At a bench trial,[1] appellees testified about various concerns that led to appellant's termination, some of which they had not previously asserted. For example, Mr. Arbour testified that appellant was laid off for

> a combined number of reasons. His ability to perform his work was declining, not accepting a project manager [position], not providing us information about his ability to continue working, his health report, it was just a lot of different things in the transition that we were trying to let him go without saying that he was a bad employee.
>
> Because in all actuality, when he first got hired, I thought it would be an amazing fit at this time, and he wasn't. And

---

[1] A jury trial was scheduled to begin on March 16, 2020. According to appellant's brief, the trial was vacated due to the Covid-19 pandemic, and on May 29, 2020, the parties agreed to proceed with a bench trial.

that day he came in, I handed [him] this letter, and he actually handed back the doctor's report that morning. But we made a decision the week prior that we were heading [towards a decision to] lay him off.

Appellees also repeatedly described their concerns about appellant's safety. For example, Mr. Gwei testified that he had conversations with appellant after Mr. Arbour notified him that "he had observed [appellant] fall downstairs in our office, and had also observed him fall at another location within our office, and also had heard complaints in the field about him having fallen on the site." Mr. Gwei further explained that he offered appellant a position as a project manager due in part to "the issues that were thought about, the safety and [appellant] falling on the projects." Mr. Lewis likewise testified that he had witnessed appellant fall "many times" on jobsites, and it was "[q]uite scary." Mr. Lewis testified that appellees discussed transitioning appellant to a project manager position because they "knew he had the mindset but not the physical ability to be a superintendent as he once was before his condition."

After the bench trial, the trial court ordered judgment in favor of appellees. On the retaliation claim, the trial court concluded that appellant failed to meet his burden to prove a causal connection between appellant's protected activity and his termination. The trial court credited testimony that Mr. Arbour gave appellant a

termination letter the same day appellant submitted his doctor's note, which the trial court referred to as a "request for accommodations." Thus, the court concluded that appellant failed to produce evidence that he engaged in a protected activity *before* he was laid off. Accordingly, the trial court held that appellant did not establish a causal connection between the two events and could not prevail on his retaliation claim.

On the disability discrimination claim, the trial court concluded that appellant failed to carry his burden to prove that appellees' legitimate, non-discriminatory reasons for terminating appellant were pretext for discrimination. Specifically, the trial court focused on the "overwhelming documentation of problems at the Marie Reed project." The trial court acknowledged that appellees had proffered various, unsupported reasons for appellant's termination, but concluded that fact alone did not prove that they had a discriminatory motive. Additionally, the trial court found it "hard to believe that [appellees] would offer to transition [appellant] from glazing field superintendent to project manager if there was an underlying discriminatory animus." This appeal followed.

## II.    Discussion

Appellant raises two issues on appeal.  First, he argues that the trial court erroneously rejected his retaliation claim on the ground that he did not engage in protected activity until after appellees decided to terminate him.  Second, he argues that the trial court erroneously rejected his discrimination claim on the ground that he failed to meet his burden to prove that appellees' proffered reasons for firing him were pretext for discrimination. [2]  We conclude that a remand is necessary for further factual findings and for the trial court to more fully respond to appellant's arguments.

When a case is tried without a jury, this court "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it."  D.C. Code § 17-305(a).  "That standard means that if the trial court's determination is plausible in light of the record viewed in its entirety, we will not disturb it whether or not we might have viewed the evidence differently ourselves."  *Hildreth Consulting Engn'rs, P.C. v. Larry E. Knight, Inc.*, 801 A.2d 967, 971-72 (D.C. 2002)

---

[2] Appellant's reply brief argues that appellees' opposition to his appeal should be deemed abandoned because appellees' brief failed to cite to the record.  Because we conclude that remand is warranted on the merits, we need not address this procedural argument.

(quoting *Nolan v. Nolan*, 568 A.2d 479, 484 (D.C. 1990)). We review de novo the trial court's legal conclusions. *Id.* at 972.

## A. Retaliation

"Under the DCHRA, it is an unlawful discriminatory practice 'to . . . retaliate against . . . any person . . . on account of having exercised . . . any right granted or protected under [the Act].'" *McFarland v. George Washington Univ.*, 935 A.2d 337, 355-56 (D.C. 2007) (quoting D.C. Code § 2-1402.61(a)). To establish a prima facie claim of discriminatory retaliation, a plaintiff must show that "(1) he was engaged in a protected activity . . . , (2) the employer took an adverse personnel action against him, and (3) a causal connection existed between the two." *McFarland*, 935 A.2d at 356 (internal quotation marks, brackets, and citation omitted).

"This court has 'often looked to cases construing Title VII [of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. (1988),] to aid us in construing the D.C. Human Rights Act.'" *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n.17 (D.C. 1993) (quoting *Atl. Richfield Co. v. D.C. Comm'n on Hum. Rts.*, 515 A.2d 1095, 1103 n.6 (D.C. 1986)). However, "we have also observed that [the DCHRA] is

different from the federal statutes in other significant ways[.]" *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 159 (D.C. 1998). Thus, while federal precedent is certainly persuasive, it "does not necessarily dictate the same result under DCHRA." *Id.* at 160.

The trial court found that appellant met his burden to establish that he engaged in a protected activity by submitting a request for accommodation, and that appellees took an adverse employment action against him. However, the court found that there was no causal connection between the two events because appellant failed to prove that appellees were aware that appellant had requested accommodations before deciding to terminate him.

Appellant argues that the trial court erred by "omit[ting] the evidence presented that [he] engaged in protected activity three and two days before his termination." Appellant refers to a series of emails that led to his doctor's note, and argues that these emails were protected activities, inasmuch as they themselves were

informal requests for accommodation or engaged Mr. Arbour in the "interactive process" of accommodation.[3]

Appellant's communications concerning his limitations were as follows. On November 13, 2017, Mr. Arbour emailed appellant asking him to provide UGC's insurance company "with a current medical clearance . . . to confirm [his] fitness for duty." The following day, on November 14, appellant asked Mr. Arbour to "forward the contact information of the insurance company[.]" He also followed up by asking Mr. Arbour, "How should I tell my doctor to word this letter??" Mr. Arbour responded that the letter should say, "To Whom it may Concern: For the standard Restriction and limitation (if any): Standing, Sitting, Walking, Lifting, Driving and any Medication Restriction." On November 15, Mr. Arbour followed up to tell

---

[3] Under the Americans with Disabilities Act, providing a "'reasonable accommodation' requires an employer 'to initiate an informal, *interactive process* with the individual with a disability in need of the accommodation' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1193 (9th Cir. 2021) (emphasis in original) (quoting 29 C.F.R. § 1630.2(o)(3)). While "an employer has an obligation to engage in an interactive process to determine a reasonable accommodation, such an obligation is only triggered where the employee has actually *requested* a reasonable accommodation." *Badwal v. Bd. of Trustees of Univ. of D.C.*, 139 F. Supp. 3d 295, 313 (D.D.C. 2015) (analyzing DCHRA claim) (emphasis in original). We therefore focus on whether appellant's communications impliedly requested an accommodation.

appellant that Mr. Arbour was "required to reach out to the doctor to confirm any and all restrictions." Appellant replied, "So, What are you trying to say?" to which Mr. Arbour responded, "We have to verify, that's all[.]" On November 16, appellant's doctor wrote a note indicating 1) appellant "is not to do any physical labor," 2) due to his condition of Parkinson's disease, he "may experience 'on and off' time several times a day," and 3) appellant "must take his medication at certain times each day and be allowed to sit down to allow his medication to reactivate his movements."

We agree with appellant that the trial court should have specifically addressed whether or not the November 13, 14, and 15 communications between appellant and Mr. Arbour amounted to protected activity. We therefore remand the case to the trial court to consider this issue. At trial, appellant argued that he "engaged in protected activity days before he handed [in] his doctor's note by asking what information UGC specifically needed from his provider." We understand appellant to argue that, by engaging in a conversation about a forthcoming doctor's note that would describe his limitations, appellant impliedly requested accommodations before he actually submitted his doctor's note. However, the trial court's order does not appear to have considered this argument, and instead focuses only on the timing between appellant's submission of the doctor's note to Mr. Arbour and his

termination.  Appellees' brief suggests that "the trial court found that [appellant's] only protected activity was the actual submission of his certification."  But at oral argument, appellees could not point to anywhere in the trial court's order where it directly addressed whether or not the November 13, 14, and 15 communications were protected activity, and we likewise do not see such a discussion in the order.

Appellees further argue that appellant's communications with Mr. Arbour could not have amounted to protected activities because appellant "made no explicit or implied statement that would convey to any reasonable person that Mr. Rose was making a request for accommodations."  We agree that appellant's discussion with Mr. Arbour does not include an explicit request for accommodations; but we view the question of whether appellant implied that he would need accommodations at least in part to be a factual issue that the trial court must address on remand.  We note that an employee need not formally ask for an accommodation.  *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).  "What matters under the ADA are not formalisms about the manner of the request, but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation."  *Id.*

Moreover, even if appellant's submission of his doctor's note was the only protected activity, we do not view the trial court's reasoning as sufficient to explain why appellant nonetheless failed to establish a causal connection between the submission of the note and his termination. The trial court explained that it:

> credit[ed] testimony that Mr. Arbour gave [appellant] a termination letter and [appellant] gave Mr. Arbour the request for accommodations on *the same day*. Therefore, the evidence does not show that [appellees] were aware of [appellant's] request for accommodation prior to making its decision to terminate [appellant].

However, just because the two events happened on the same day does not eliminate the possibility that the doctor's note caused Mr. Arbour to terminate appellant's employment. Indeed, "[t]he causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 579 (D.C. 2000). On remand, the trial court should further explain why it reached the conclusion that there was no causal connection between the two events.

## B.    Discriminatory Intent

Appellant next argues that the trial court erred by failing to conclude that appellees terminated his employment because of his disability.   While we acknowledge that there is ample evidence in the record that appellant's work performance declined prior to his termination, we remand the case to the trial court to consider whether appellant was laid off, in part, due to his disability.

The DCHRA prohibits an employer from terminating an employee "wholly or partially" based on disability.  D.C. Code § 2-1402.11(a)(1).  "In considering claims of discrimination under the DCHRA, we employ the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)."  *McFarland*, 935 A.2d at 346 (internal quotations and citations omitted). The employee must

> establish a prima facie case that [the employer discriminated against him].  If such a showing is made, the burden shifts to the employer to articulate a legitimate basis for [its action].   If the employer articulates a legitimate, nondiscriminatory basis for the [action], the burden shifts back to the employee to demonstrate that the employer's action was pretextual.

*Id*. (internal quotation marks, brackets, and citations omitted).

Here, the trial court concluded that appellant failed to prove that his employment was terminated for a discriminatory reason. Despite appellees' "shifting" reasons for terminating appellant, the trial court noted that there was "overwhelming documentation" of appellant's declining performance at the Marie Reed project. Additionally, the trial court found it "hard to believe" appellees acted with discriminatory animus in terminating appellant because they had previously sought to retain him by moving him to an in-office position.

We agree with the trial court that there is ample evidence in the record demonstrating that appellant's performance at the Marie Reed project declined, and that poor work performance is a legitimate, non-discriminatory reason to terminate an employee. Additionally, though we consider appellees' "shifting" reasons for terminating appellant's employment strong evidence of pretext, we also acknowledge that the burden on appellant is to "show *both* that the reason was false,

*and* that discrimination was the real reason." *McFarland*, 935 A.2d at 355 (emphasis in original) (internal quotations and citations omitted). [4]

However, there is a need for the trial court to address whether appellant's employment might have been terminated *in part* due to his disability. At trial, appellant framed the issue for the trial court as "whether [appellees'] reason[] for terminating [appellant] was made wholly or partially because of his disability and/or protected activities." Appellant also moved for a directed verdict, noting that Mr. Lewis and Mr. Arbour both testified about their

> continual concerns regarding [appellant's] disability and the limitations imposed by his disability and that they were considered in the decision to terminate him. And because of that, [appellant] would be entitled to judgment on that based on these admissions that UGC . . . terminated [appellant] at least partially because of his disability, which is all that plaintiff must show to succeed on that claim.

---

[4] We note that appellees have never articulated a clear or consistent reason for terminating appellant's employment. The original termination letter sent to appellant stated "this layoff is not a statement about your work for United General Contractors. You have been a dedicated, contributing employee for nearly one year." As the trial court found, and appellees' brief acknowledges, "[a]t various points during litigation, [appellees] have offered excessive absences, financial considerations, safety considerations, and legitimate business reasons as additional justifications." Nonetheless, the trial court found evidentiary support only for appellant's poor performance, and appellant continues to dispute appellees' other proffered reasons.

The trial court denied appellant's motion for a directed verdict, explaining that "the testimony here is that they were concerned about his safety. That does not mean that it was his disability that fueled their decision." The record does not indicate whether the trial court considered some of the other testimony in the trial record, nor whether the trial court considered whether a discriminatory motive could be one of several motives for the termination.

Important here, the statute provides that it is unlawful to terminate an employee even *partially* for a discriminatory reason. D.C. Code § 2-1402.11(a)(1). The "employee may prevail by proving that the employer's action was motivated 'partially' by a discriminatory reason, even if it also was motivated by permissible reasons not, in themselves, pretextual." *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008). In this case, a "'mixed motive' analysis is appropriate." *Id.* Under either the *McDonnell Douglas* standard or a "mixed motives" analysis, "the burden of persuasion 'remains at all times' with the plaintiff employee to prove that the employer took adverse action for a discriminatory or retaliatory reason (in whole or part)." *Id.*

We have not had occasion to squarely address the level of causation necessary for a "mixed motives" claim.[5] In *Babb v. Wilkie*, 206 L. Ed. 2d 432, 140 S. Ct. 1168, 1172 (2020), the Supreme Court explained that it need not go any further than the Age Discrimination in Employment Act's text in determining when to impose liability because the ADEA mandates that personnel actions "shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Because "free from" means "untainted" and because the statute prohibits "*any* discrimination based on age," the Supreme Court concluded that "the statute does not require proof that an employment decision would have turned out differently if age had not been taken into account." *Babb*, 140 S. Ct. at 1173-74. Thus, a plaintiff could show a violation of Section 633a(a) "without proving that age was a but-for cause" of the action. *Id.* at 1177.

Similarly, in the Title VII context, a plaintiff need "only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (quoting 42 U.S.C. § 2000e-2(m)). "It suffices instead to show that the motive to

---

[5] In *Furline*, 953 A.2d at n.28, we presumed, but did not decide, that an employer would be entitled to an affirmative defense if it could show that it would have taken the action for permissible reasons alone.

discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).[6]

Both the Washington Supreme Court and the California Supreme Court came to similar conclusions in interpreting their own antidiscrimination statutes, which both prohibit adverse employment action "because of" protected characteristics. *See Mackay v. Acorn Custom Cabinetry, Inc.*, 898 P.2d 284, 288 (Wash. 1995) (en banc); *Harris v. City of Santa Monica*, 294 P.3d 49, 72 (Cal. 2013). Noting Washington's "resolve to eradicate discrimination," the court reasoned that adopting a standard akin to "but for" causation would "erect [a] high barrier to recovery" and that "Washington's disdain for discrimination would be reduced to mere rhetoric[.]" *Mackay*, 898 P.2d at 288. Thus, a plaintiff must only show that a protected attribute

---

[6] "But for" causation is still important in determining the appropriate remedy in the federal context. Thus, in a Title VII case, a "defendant may still invoke lack of but-for causation as an affirmative defense, but only to stave off damages and reinstatement, not liability in general." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 206 L. Ed. 2d 356, 140 S. Ct. 1009, 1017 (2020) (citing 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B)). Similarly, in an ADEA case, to obtain reinstatement, backpay, or compensatory damages, a "plaintiff[] must show that age discrimination was a but-for cause of the employment outcome." *Babb*, 140 S. Ct. at 1177-78. Otherwise, plaintiff can seek "injunctive or other forward-looking relief" as the trial court deems necessary to redress the injury. *Id.* at 1178.

was a "substantial factor" in an adverse employment decision. *Id.* Similarly, the California court undertook an exhaustive analysis of federal and state antidiscrimination law and concluded that a plaintiff could prevail upon a showing that "an adverse employment action was motivated at least in part by discrimination." *Harris*, 294 P.3d at 60.[7]

The DCHRA prohibits taking a personnel action even partially for a discriminatory reason, D.C. Code § 2-1402.11(a), a "standard comparable to that in [42 U.S.C. § 2000e-2(m)]." *Furline*, 953 A.2d at 353 n.28. The statute was passed "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit[.]" D.C. Code § 2-1401.01. Based on the statutory text and intent, the statute is violated if an employer took the action with one discriminatory motive, even if the employer had other lawful motives. A plaintiff's burden, then, is to show that a protected characteristic was a substantial factor in the employment decision. "A 'substantial factor' means that the protected characteristic was a significant motivating factor bringing about the employer's decision."

---

[7] In the California context, like the federal context, an employer is entitled to an affirmative defense if it can show it would have made the same decision for lawful reasons. *See Harris*, 294 P.3d at 72. In that case, a plaintiff is not entitled to damages, backpay, or reinstatement but may still be entitled to declaratory or injunctive relief or reasonable attorneys' fees and costs. *Id.*

*Scrivener v. Clark Coll.*, 334 P.3d 541, 545 (Wash. 2014) (en banc). "It does not mean that the protected characteristic was the sole factor in the decision." *Id.*; *see also* 42 U.S.C. § 2000e-2(m) (allowing for liability when "the complaining party demonstrates that race, color, religion, sex, or national original was a motivating factor for any employment practice, even though other factors also motivated the practice.").

Here, when asked why appellant was terminated, Mr. Arbour testified that appellant was laid off for "a combined number of reasons[,]" including "not accepting a project manager" position, "not providing us information about his ability to continue working," and "his health report." Mr. Arbour further testified that "[we] had to lay him off because he's – the big circle and everything else going on, it was really hard to do, lack of performance, not showing up to work, falling all the time. I just don't want to see him hurt himself." During closing argument, appellant's counsel also argued that appellees'

> continual emphasis on supposed concerns regarding [appellant's] limitations imposed on . . . his ability to work demonstrates . . . that animus is directly on their mind and that [appellant's] Parkinson's disease was directly impacting their decision-making process.

While safety concerns about a disabled employee, without more, might not prove that he was subject to discrimination, the surrounding context here requires a closer examination of that possibility. The trial court found that appellees' offer of the project manager position to appellant negated any discriminatory animus. We can imagine a scenario where offering appellant a position change would be consistent with discrimination. For example, appellees might have offered appellant the project manager position to avoid providing him with reasonable accommodations that would allow him to keep his position, as the law required them to do. Appellees did not need to harbor complete animus toward appellant in order to act with a partially discriminatory motive.

The trial court's written order should have provided an analysis of the employers' testimony regarding their concerns about appellant's safety in his position as glazing field superintendent. We pay particular attention to appellees' repeated description of their concerns about appellant's safety on the construction site when describing his work performance.[8] Appellees continued to refer to their

---

[8] For example, when asked in general terms how appellant's work product was, Mr. Arbour answered:

> Well, taking into [account] his . . . disability, we
> understood where he stood – where he was at in his

safety concerns when explaining appellant's declining work performance and their decision to terminate his employment. The trial court's analysis of whether appellees' safety concerns reflected a discriminatory motive in their ultimate termination of appellant's employment is necessary for our consideration of whether appellees' actions stemmed, at least in part, from appellant's disability.

Additionally, a clearer explanation of why the trial court found that appellant was not terminated even partially because of his disability is also necessary. While the trial court ultimately concluded that appellant "[had] not established that

> capabilities of what he could perform. And he met those when we first hired him. . . . It just seemed over time there was more and more – he had more and more complications in his performance tasks, like showing up for work – not showing up for work, I should say. He had gotten in a few different car accidents. He broke bones. He was falling down. It was just over a matter of time it progressively got worse.

Likewise, when asked generally about hiring appellant, Mr. Lewis testified that

> He told us about his situation. . . . We knew his mind was sharp, but we had no idea that he had as many limitations as he has until later on. . . . [W]hen we first interviewed [appellant], his mobility didn't seem like it would be a problem at that time, but as time went on, he explained that his device that was planted in his chest needed to be calibrated, and that's why he was having so many problems with falling and what-have-you.

discrimination was a substantial factor in his termination," the trial court made this statement in its analysis under the *McDonnell Douglas* framework. The trial court did not squarely address appellant's argument that his termination was "motivated partially by a discriminatory reason, even if it also was motivated by permissible reasons not, in themselves, pretextual." *Furline*, 953 A.2d at 353.

## III.   Conclusion

In sum, we remand the case to the trial court to consider whether appellant's communications with Mr. Arbour, before he submitted his doctor's note, "provide[d] [appellees] with enough information that, under the circumstances, [they could] be fairly said to know of both the disability and desire for an accommodation." *Taylor*, 184 F.3d at 313. We also remand for the trial court to determine whether appellees terminated appellant in part based on his disability. *See Furline*, 953 A.2d at 353.

Accordingly, the judgment on appeal is hereby

*Reversed and remanded.*